UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KEITH NIEMIC, | ) | |
| Plaintiff | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| STANLEY GALAS, ARTHUR BREWER, M.D., | ) | CIVIL ACTION NO. 1:04-CV-11482-NMG |
| JUNE BINNEY, JEFF SHOREY, R.N., | ) | |
| KARA ERDODY, R.N., DONNA | ) | |
| FITZGERALD, L.P.N., DONALD KERN, M.D., | ) | |
| and GURVINDER JAISWAL, M.D., ET AL., | ) | |
| Defendants | ) | |

## MEDICAL DEFENDANTS' STATEMENT OF
## MATERIAL FACTS IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

The defendants, ***Stanley Galas, N.P., Arthur Brewer, M.D., June Binney, Jeff Shorey, R.N., Kara Erdody, R.N., Donna Fitzgerald, L.P.N., Donald Kern, M.D., and Gurvinder Jaiswal, M.D.***, submit the following statement of material facts, which are not in dispute, in support of their Motion for Summary Judgment:

1.  The plaintiff names Arthur Brewer, M.D. as a defendant in this cause of action. Dr. Brewer was the UMass Correctional Health ("UMCH") Program Medical Director during all times relevant to this Complaint. While Dr. Brewer did not provide Mr. Niemic with direct medical care, he oversaw the medical care provided by UMCH staff at all Massachusetts prison facilities. *(See Affidavit of Arthur Brewer, M.D., ¶2).*

2.  Mr. Niemic also names Stanley Galas as a defendant in this cause of action. Mr. Galas was the Health Services Administrator at MCI-Cedar Junction during the dates listed in plaintiff's Complaint. Mr. Galas is a licensed nurse practitioner and employee of UMCH. *(Affidavit of Arthur Brewer, M.D., ¶5).*

3.  Named medical defendant, June Binney, was the Program Director for UMCH during the timeframe relevant to this cause of action. Ms. Binney is also an employee of UMCH. *(Affidavit of Arthur Brewer, M.D., ¶¶5-6).*

4.  Mr. Niemic also names Jeff Shorey, R.N., Kara Erdody, R.N., and Donna Fitzgerald, L.P.N. as medical defendants in this matter. All three named defendants were nurses employed by UMCH. These individuals were working in the Health Services Unit ("HSU") at MCI-Cedar Junction during the time alleged in plaintiff's Complaint. *(Affidavit of Arthur Brewer, M.D., ¶5).*

5.  Plaintiff also names Donald Kern, M.D. and Gurvinder Jaiswal, M.D. as medical defendants in his Complaint. Both Dr. Kern and Dr. Jaiswal were physicians employed by UMCH during all times relevant to this Complaint. *(Affidavit of Arthur Brewer, M.D., ¶5).*

6.  *Pro se* plaintiff, Keith Niemic, was at all times relevant to this Complaint a prisoner incarcerated at MCI-Cedar Junction, under the jurisdiction of the Massachusetts Department of Correction. *Complaint, ¶3.*

### History of Migraine Treatment
### (See Exhibit 1, A through F)

7.  Mr. Niemic has a history of migraines dating back to his childhood. (See Exhibit 1A attached, progress notes). On November 23, 2001, the defendants prescribed Darvon to treat plaintiff's headache pain. (Exhibit 1A, progress note; Exhibit 1B attached, physician order). While the treating UMCH physician, Dr. Rencricca, was not enthusiastic about prescribing Darvon, due to the drug's addictive nature, he prescribed the narcotic because Mr. Niemic's migraines were severe. (Exhibit 1A).

2

8.    On December 3, 2001, the clinical pharmacist recommended treating Mr. Niemic's migraines with Imitrex instead of Darvon.  The plaintiff agreed to this proposed change in treatment.  (Exhibit 1A).  However, because the defendants subsequently suspected that the plaintiff had suffered an allergic reaction to the Imitrex, UMCH began treating Mr. Niemic's headaches with Ibuprofen until this inmate could be examined by the LSH neurology clinic on December 19, 2001.  (Exhibit 1A, progress note dated December 9, 2001).

9.    On December 19, 2001, Mr. Niemic was examined by Dr. Drewniak at the LSH neurology clinic.  (Exhibit 1D attached, LSH consultation).

10.    On December 20, 2001, as per Dr. Drewniak's recommendation, the defendants prescribed Vioxx to treat Mr. Niemic's migraines.  (Exhibit 1B).  Because this drug caused plaintiff abdominal pain, the defendants later replaced the Vioxx with Fiorinal.  (Exhibit 1A, dated December 29, 2001).

11.    Mr. Niemic requested that his Fiorinal be replaced with the stronger narcotic, Darvon, in January 2002.  However, the defendants refused this request because the DOC pharmacy was concerned about Darvon's addictive nature.  Instead, the defendants prescribed Ultram, and ordered another LSH consult with the neurology clinic.  (Exhibit 1A, dated January 5, 2002; Exhibit B).  From February 2002 through April 2002, the plaintiff was taking Ultram to treat his migraine headaches. (Exhibit 1B).

12.    On April 30, 2002, Dr. Kasim Gouda prescribed Midrin to replace plaintiff's Ultram medication, in addition to ordering a neurology consult.  (Exhibit 1B).  On May 9, 2002, Mr. Niemic wrote five (5) separate letters to the Health Services Unit

3

("HSU") stating that he needed Darvon for his migraines.    (See Exhibit 1C attached, plaintiff's grievance).

13.    When the plaintiff did not receive the Darvon, Mr. Niemic became angry. (Exhibit 1A, dated May 17, 2002).

14.    On May 14, 2002, former UMCH Health Services Administrator, David Stringham, Ph.D., informed Mr. Niemic that Darvon is not good for patients with liver disease– an ailment which plaintiff suffered from as a result of his Hepatitis C.    (Exhibit 1C, defendants' grievance response).

15.    On May 27, 2002, Mr. Niemic was admitted to the HSU for pain management, and on May 31, 2002, defendant Jaiswal ordered a CT scan with contrast of plaintiff's head to rule out a tumor or aneurysm.    (Exhibit 1A;  Exhibit 1D attached, UMCH consult request). On this same date, Dr. Jaiswal noted that the plaintiff was drug/narcotic seeking, refusing to take non-narcotic medication to treat his migraine pain.  (Exhibit 1A).

16.    On June 4, 2002, a head CT scan found the plaintiff's brain to be completely normal.  (See Exhibit 1E attached, LSH consultation).  While the defendants were still treating the plaintiff's migraines with Fiorinal, in June 2002, Mr. Niemic continued to demand narcotic medication.    (Exhibit 1A, dated June 12 2002). Every time the defendants offered plaintiff non-narcotic medication, Mr. Niemic refused the drugs.  (Exhibit 1A).

17.    In response to plaintiff's continued demands for Darvon medication, defendant Brewer discussed Mr. Niemic's case with the Health Services Unit at MCI-Cedar Junction.  On June 13, 2002, the defendants once again explained to this plaintiff

4

that UMCH had stopped his Darvon prescription because this narcotic could be harmful to plaintiff's Hepatitis C. (Exhibit 1C, defendants' grievance response).

18.   On June 12, 2002, defendant Jaiswal called plaintiff's block officer to inquire whether the plaintiff had recently complained of vomiting, nausea or pain, as he alleged during that day's examination. The block officer informed Dr. Jaiswal that Mr. Niemic never complained of these ailments and spent all his time preparing legal work. (Exhibit 1A). Once again, on this date, Dr. Stringham explained to the plaintiff that he was not being treated with Darvon due to medical concerns, specifically his liver disease. Instead, Mr. Niemic was told he could have Tylenol, Motrin, and Naprosyn for his headaches. (Exhibit 1C, defendants' grievance response).

19.   On July 22, 2002, Dr. Brewer wrote directly to the plaintiff regarding the risks involved in taking Darvon. In addition, Dr. Brewer explained that the pharmacy routinely advises against prescriptions when appropriate, as in this instance. (Exhibit 1C, defendants' grievance response).

20.   Despite these explanations, on August 2, 2002, plaintiff once again requested that Dr. Jaiswal give him narcotic medication for his migraines. On this occasion, Mr. Niemic threatened to report Dr. Jaiswal to the Board of Registration in Medicine for abuse, if he did not obtain the desired drugs. (Exhibit 1A). Through a second call to plaintiff's cell block officer, Dr. Jaiswal once again confirmed that plaintiff was behaving normally, and showing no signs or symptoms of sickness while in his cell. (Exhibit 1A).

5

21. In October 2002, the defendants recommended that Mr. Niemic try a relaxation technique to relieve his migraines. (Exhibit 1C, sick call request). In addition, on November 14, 2002, the defendants ordered another neurology consult for the plaintiff. (Exhibit 1D, UMCH consult request). On and around this time, the defendants prescribed plaintiff Fiorinal and Robaxin to treat his migraines. (Exhibit 1B).

22. On November 21, 2002, defendant Brewer reviewed the UMCH consult request and recommended plaintiff for an LSH neurology consult. (Exhibit 1A). By March 2003, Mr. Niemic was scheduled to visit the LSH in April 2003. (Exhibit 1A, dated March 21, 2003). In the interim, Mr. Niemic's migraines were treated with Robaxin, Fiorinal, and Motrin. (Exhibit 1B).

23. On April 4, 2003, LSH neurologist, Dr. Bharani, prescribed Verapamil and Midrin to treat plaintiff's migraines, specifically requesting that the defendants not prescribe Ultram and opiates. (Exhibit 1E, LSH consultation). When the plaintiff complained that he could not take Midrin, defendant Galas instead prescribed Axert. (See Exhibit D attached, UMCH consultation dated April 15, 2003).

24. During a follow-up LSH neurology consult with Dr. Bharani on June 6, 2003, the neurologist recommended that plaintiff try Klonopin for one month to determine whether his anxiety was a side effect of the previously prescribed Verapamil medication. (Exhibit 1E, LSH consultation). Despite the plaintiff's alleged dissatisfaction with his migraine drugs, the medical records indicate that from June 2003 through December 2003, the plaintiff appeared satisfied with the defendants'

Klonopin or Motrin prescriptions. (Exhibit 1B; Exhibit C attached, plaintiff's grievance records).

25. On December 22, 2003, a non-focal neurological CT scan came back negative, and defendant Kern subsequently ordered consults, requesting a recommendation as to whether UMCH should discontinue plaintiff's Klonopin and treat his headaches symptomatically. (Exhibit 1D, UMCH consultation dated December 22, 2003 & February 4, 2004). While the defendants awaited this neurology appointment, they continued to prescribe Klonopin and Motrin for plaintiff's headaches. (Exhibit 1B).

26. On February 27, 2004, Dr. Bharani recommended taking plaintiff off Klonopin, and instead treating his migraines with Topamax, Zomig, and Indomethacin. (Exhibit 1E, LSH consultation). Consequently, on March 1, 2004, Dr. Kern ordered Axert and Indocin, while decreasing plaintiff's Klonopin medication. (Exhibit 1B).

27. On March 22, 2004, defendant Galas responded to Mr. Niemic's March 3rd letter, explaining that while Dr. Kern prescribed Axert rather than Zomig, Dr. Bharani's recommendation was satisfied because they are similar medications. Additionally, Stanley Galas noted that it was Mr. Niemic who was choosing not to follow Dr. Bharani's medical orders, not the defendants who were denying him treatment. (Exhibit 1C, defendants' grievance response).

28. On March 18, 2004, the plaintiff requested that the defendants discontinue his Axert, Indocin, and Topamax, and instead prescribe him Aspirin for his headaches.

974594v1

(Exhibit 1 C, sick call request).  The defendants complied with plaintiff's request on March 29, 2004.  (Exhibit 1B).

29.  On April 2, 2004, Dr. Bharani discontinued plaintiff's Topamax prescription because Mr. Niemic complained that the drug made him feel "weird."  Instead, Dr. Bharani recommended Celebrex, so that Mr. Niemic could resume his Hepatitis C treatment.  (Exhibit 1E, LSH consultation).  Dr. Bharani noted that the plaintiff did not need to return to the neurology clinic for another four to six months.

30.  While Mr. Niemic complained, on April 12, 2004, that Dr. Kern only ordered Aspirin for his headaches, rather than the Celebrex Dr. Bharani had recommended, defendant Galas explained, on both April 21 and 26, 2004, that Celebrex is not clinically indicated for headaches and that it can actually cause headaches.  Stanley Galas noted that Mr. Niemic had agreed to an Aspirin drug regimen on March 29, 2004; however, he still offered plaintiff the opportunity to take Vioxx, a similar drug to Celebrex, if he insisted on following Dr. Bharani's suggestions.  (Exhibit 1C, defendants' grievance response).

31.  On May 6, 2004, defendant Kern requested another appointment with Dr. Bharani for August 2004.  (Exhibit 1D, UMCH consultation request).  Also on this date, Dr. Kern ordered Feldene to replace plaintiff's Aspirin prescription through July.  (Exhibit 1B).

32.  When Mr. Niemic complained that he was dissatisfied with the Feldene drug, defendants informed him that his concerns would be addressed at the upcoming August neurology appointment.  (Exhibit 1C, sick call request dated June 4, 2004).

8

On June 7, 2004, the defendants decreased plaintiff's Feldene prescription and ordered Motrin to treat his migraine pain. (Exhibit 1B).

33.  In July 2004, Mr. Niemic began to complain again about his headaches. (Exhibit 1C, sick call request). The records show, however, that just a few days earlier, plaintiff had refused to visit with an eye doctor to assess the possible cause of his headaches. (Exhibit 1A, release of responsibility form dated July 14, 2004; Exhibit 1C, inmate grievance appeal form).

### Hepatitis C Treatment
### (See Exhibit 2, A through F)

34.  Plaintiff was diagnosed with Hepatitis C on May 3, 1999. (See Exhibit 2A attached, Hepatitis C confidential case report). The defendants treated this disease intermittently with Pegylated/Interferon and Ribavirin therapy during Mr. Niemic's stay at MCI-CJ. (See Exhibit 2C attached, letter from plaintiff). It should be noted that the defendants stopped Mr. Niemic's Hepatitis drug therapy in 2003 because the plaintiff had repeatedly complained that the drugs increased the severity of his migraines. (Exhibit 2A; Exhibit 2C).

35.  Because plaintiff's LFT levels were abnormally high, in and around June 2001, defendants sent Mr. Niemic to LSH physician, Dr. Drewniak, on July 3, 2001 for an evaluation. The defendants also sent Mr. Niemic for a liver biopsy on August 27, 2001. (Exhibit 2E, LSH consultation dated December 19, 2001; Exhibit 2F attached, lab report).

36.  A November 7, 2001 status post of plaintiff's liver biopsy at the chronic disease ("CD") clinic indicated that the August liver biopsy was normal. As such,

defendants recommended that plaintiff return to the clinic in three (3) months. (Exhibit 2A).

37. On December 19, 2001, the defendants sent Mr. Niemic to Dr. Drewniak's office, where the doctor noted that Mr. Niemic was a good candidate for Interferon/ Ribavirin treatment and recommended these drugs to treat the disease. (See Exhibit 2E attached, LSH consultation). As such, on December 20, 2001, defendants ordered Interferon and Ribavirin to treat Mr. Niemic's Hepatitis C. (See Exhibit 2B attached, physician orders).

38. On December 29, 2001, only ten (10) days after the initial prescription, Mr. Niemic complained that his daily Interferon and Ribavirin injections were causing serious flu-like symptoms, and also magnifying his migraine pain. (Exhibit 2A); Complaint, ¶24.

39. On February 15, 2002, defendant Jaiswal reviewed plaintiff's most recent CD visit report, and noted that plaintiff only had mild side effects from taking the Interferon and Ribavirin drugs. (Exhibit 2A).

40. Thereafter, on March 27, 2002, Kasim Gouda, M.D. reviewed plaintiff's Hepatitis C levels and ordered an HCV RNA test, noting that the drug therapy should not be continued unless Mr. Niemic was responding to the Hepatitis C drug regiment. Dr. Gouda recommended that plaintiff return to the clinic for another evaluation in two (2) months. (Exhibit 2E, LSH consultation). Subsequently, on March 29th, the defendants noted that they would refer plaintiff to the LSH GI clinic for review of his Hepatitis in two (2) months. (Exhibit 2A).

10

41.  As of April 4, 2002, plaintiff's HCV RNA was less than 600, his Hepatitis C viral RNA was less than 1000, and his LFTs were within the normal range. (Exhibit 2F, Quest diagnostic & lab report). As such, plaintiff's Hepatitis C drug therapy was renewed. (Exhibit 2B, dated April 5, 2002).

42.  In May 2002, plaintiff's LFTs continued to be within the normal range. (Exhibit 2F). However, because plaintiff repeatedly complained that his headaches were worsening, Dr. Jaiswal requested another CD visit to re-evaluate the Hepatitis C drug therapy. (Exhibit 2A, dated May 24, 2002; Exhibit 2D, UMCH consultation request dated May 31, 2002); Complaint, ¶30.

43.  While plaintiff alleges that he was forced to give up his liver treatment due to improper migraine management, Mr. Niemic's June and July 2002 medical records indicate that it was the plaintiff who refused to take his Interferon. (Exhibit 2A, release of responsibility dated June 28, 2002; Exhibit 2D, UMCH consult request dated June 8, 2002); Complaint, ¶33.

44.  Until July 9, 2002, the defendants continued prescribing Ribavirin and Interferon for plaintiff's Hepatitis C. (Exhibit 2B; Exhibit 2C, dated July 16, 2002). As of July 21, 2002, plaintiff's HCV RNA was reported at less than 550. (Exhibit 2F). During a visit with Dr. Drewniak on July 23rd, the physician noted that there was a high probability that plaintiff's HCV would relapse in six (6) months without Hepatitis C treatment. (Exhibit 2E). As such, Dr. Drewniak suggested that if plaintiff stopped taking the drug therapy, he should return to the LSH clinic in six (6) months to re-evaluate his Hepatitis C. (Exhibit 2E).

11

45.  On August 2, 2002, Dr. Jaiswal noted that Mr. Niemic had stopped taking his Hepatitis drug treatment to manipulate the defendants' willingness to prescribe narcotics.  (Exhibit 2A).  As of August 2002, plaintiff's HCV RNA quantity remained undetectable, at less than 550.  (Exhibit 2F).

46.  In September 2002, the defendants decreased plaintiff's Interferon and Ribavirin treatments and ordered another HCV RNA viral load test.  (Exhibit 2B, dated September 20, 2002; Exhibit 2F, dated September 27, 2002).  On September 29, 2002, plaintiff begrudgingly allowed his HCV RNA to be drawn.  The BDNA was still undetectable, at less than 550.  (Exhibit 2A, release of responsibility; Exhibit 2F).

47.  On November 9, 2002, UMCH re-checked plaintiff's viral load, which was still undetectable, and noted that plaintiff had responded well to the discontinuation of his Hepatitis C therapy.  UMCH planned to recheck Mr. Niemic's LFTs and viral load again in December 2002.  (Exhibit 2A).

48.  As of December 20, 2002, plaintiff's LFTs were still within the normal range, and his HCV RNA quantity was steady at 1406.  (Exhibit 2F).

49.  On February 27, 2003, plaintiff notified Dr. Jaiswal that he wanted to restart the Interferon treatment for his Hepatitis C.  While Mr. Niemic was belligerent toward this defendant during the meeting, Dr. Jaiswal noted that he would discuss plaintiff's Interferon treatment with an LSH, GI physician.  (Exhibit 2A).  Specifically, in April, Dr. Jaiswal ordered an HCV viral load follow-up and an LFT test.  (Exhibit 2B, dated April 15 and 22, 2003).

50.   On May 30, 2003, defendant Galas ordered another follow-up HCV RNA viral load for the plaintiff. (Exhibit B). The test results indicated that plaintiff's HCV RNA quantity had increased to 101879, well above the 550 level. (Exhibit 2F, dated June 16, 2003).

51.   Given plaintiff's rising HCV RNA level, in July 2003, Dr. Jaiswal ordered a Pegylated Interferon form and a GI consult for Mr. Niemic. (Exhibit 2B, dated July 7, 2003). As of August 7, 2003, Mr. Niemic was scheduled to visit the LSH GI clinic in December 2003. (Exhibit 2C, sick call request dated August 2, 2003).

52.   On September 8, 2003, plaintiff was found unconscious in his cell. Complaint, ¶49. He had needle marks on his arms, his pupils were constricted, and plaintiff tested positive for heroin and cocaine. (Exhibit 2A). Community standards dictate that participating in risky behavior defeats the purpose of Hepatitis therapy. Thus, if a patient tests positive for illegal drugs, the UMCH Program Medical Director (defendant Brewer) and the GI Clinic may choose to delay Hepatitis C treatment for a period of twelve (12) months. (Exhibit 2C, letter from Galas to plaintiff dated September 25, 2003; memo from Galas to Allen dated October 17, 2003).

53.   While Mr. Niemic was scheduled to visit the CD clinic on September 10, 2003, because of the positive September 8th drug test, Mr. Niemic was admitted into the HSU to treat his withdrawals. (Exhibit 2A).

54.   On September 29, 2003, Dr. Jaiswal, Dr. Brewer and LSH physician, Dr. Drewniak, planned to discuss plaintiff's viral load and recent positive drug screen. (Exhibit 2C, sick call request). The defendants jointly agreed with the GI clinic to delay Hepatitis treatment for one (1) year; however, they continued to

13

monitor Mr. Niemic's LFTs.  (Exhibit 2C, letter from Stanley Galas to Allen dated October 17, 2003; Exhibit F).  Specifically, as of October 2003, Mr. Niemic's LFTs were returning to the normal range.  (Exhibit 2E, dated October 8, 2003).

55.   In an attempt to educate plaintiff of the effect of illicit drug use on UMCH's Hepatitis C treatment procedure, Verdene Colman-Smith met with the plaintiff on November 6, 2003.  (Exhibit 2A).  Thereafter, on December 17, 2003, the defendants sent Mr. Niemic to the LSH for a review of his Hepatitis C, and on December 31, 2003, they sent plaintiff to the CD clinic, where defendant Kern ordered a follow-up LFT test for February 2004.  (Exhibit 2A; Exhibit 2B).

56.   When Mr. Niemic's LFTs were slightly elevated on February 16, 2004, defendants resent Mr. Niemic to the CD clinic for an evaluation on March 11, 2003, where the staff noted that plaintiff did not exhibit new symptoms of Hepatitis C.  (Exhibit 2A; Exhibit 2B).

57.   On June 4, 2004, the plaintiff refused a CD visit for treatment of his Hepatitis C.  (Exhibit 2A, release of responsibility).  On June 14, 2004, when plaintiff complained of liver pain and requested a viral load check, the defendants ordered a review of plaintiff's LFTs, which were within the normal range according to a July 21, 2004 lab test.  (Exhibit 2C, sick call request; Exhibit 2F, dated June 21, 2004).  While plaintiff began to request liver treatment in June 2004, defendant Galas reminded Mr. Niemic on June 22, 2004 that he needed to be clear from illegal substances for one year before he would be considered for Interferon treatment.  (Exhibit 2C, letter from Galas to plaintiff dated June 22, 2004).

58. As of June 28, 2004, plaintiff's liver was not enlarged, and his LFTs were within normal limits. (Exhibit 2A). As of July 5, 2004, Mr. Niemic had a decreased viral load. (Exhibit 2A, problem list at SBCC).

**History of Chest Pain Treatment**
**(See Exhibit 3, A through F)**

59. Plaintiff first complained of chest pain on November 12, 2001, in connection with having hives on his chest. (See Exhibit 3C attached, letter from plaintiff). However, Mr. Niemic did not notify the defendants of his chest pain, relating to Vioxx, until December 25, 2001. (Exhibit 3C, sick call request).

60. When plaintiff complained of chest pain, combined with shortness of breath, on January 19, 2002, the defendants ordered an EKG and checked plaintiff's blood pressure on January 22, 2002. (See Exhibit 3B attached, physician orders; Exhibit 3C, letter from plaintiff). At this time, UMCH doctors were concerned that Mr. Niemic's chest pain was related to his Interferon intake, or a separate medical condition. As such, the defendants prescribed Baby Aspirin to treat plaintiff's pain. (See Exhibit 3A attached, progress notes; Exhibit 3B, dated January 24, 2002).

61. On February 5, 2002, a UMCH doctor reviewed plaintiff's chest condition, treating plaintiff's chest pain with Motrin. (Exhibit 3A). As of February 15, 2002, Mr. Niemic's chest and lungs were clear, and his resting respiratory heart rate was negative. (Exhibit 3A).

62. On March 4, 2002, UMCH ordered an EKG and prescribed Motrin. (Exhibit 3B; Exhibit 3C, sick call request).

63. On July 5, 2002, Mr. Niemic complained once again. Based on this July complaint, the UMCH doctor evaluated plaintiff's sternum, noting that it was not radiating.

15

The doctor ordered an EKG and advised the staff to monitor the plaintiff while in his cell. (Exhibit 3A). Mr. Niemic was also given Tylenol and periodic blood pressure checks on this date, and he seemed happy when he left the HSU. (Exhibit 3A; Exhibit 3B).

64.    On July 29, 2002, plaintiff once again notified the defendants that he experienced chest pain during a handball game. In response, the defendants ordered a regular sinus rhythm, ordered a CTA, and prescribed Aspirin. (Exhibit 3A; Exhibit 3B).

65.    While Mr. Niemic's chest pain disappeared after August 2002, on May 6, 2003, plaintiff once again complained of shortness of breath and chest pain. (Exhibit 3C, sick call request). On May 8, 2003, Dr. Jaiswal noted that plaintiff's blood pressure was elevated at 126/96. However, the rest of the defendant's exam was unremarkable. (Exhibit 3C, sick call request). Plaintiff's increased heart rate was determined to be related to his anxiety, and was treated with Motrin. (Exhibit 3B, dated August 3, 2002).

66.    Mr. Niemic did not have another bout of chest pain for seven months, until December 28, 2003, when he asked a UMCH doctor to give him Aspirin. (Exhibit 3A). While the defendants offered the plaintiff a hospital evaluation, plaintiff refused both an assessment and Motrin medication for his pain. Mr. Niemic told the nurse to go away and that he was fine. (Exhibit 3A).

67.    While plaintiff alleges that defendant Kern ignored his complaints of chest pain on March 30, 2004, there are no medical records indicating that Mr. Niemic filed any complaints for chest pain on or around this date. (Exhibit 3C). In fact, the plaintiff

did not complain again of chest pain on any dates listed in his Complaint (through August 2004). (Exhibit 3C).

### History of H. Pylori Treatment
### (See Exhibit 4, A through F)

68.  While plaintiff's Complaint alleges medical mistreatment starting in 2001, the plaintiff requested an H. Pylori test on May 12, 2003. (See Exhibit 4A attached, progress notes; Exhibit 4C attached, sick call request). An H. Pylori test was ordered that same day. (See Exhibit 4B attached, physician orders).

69.  On May 17, 2003, the H. Pylori test came back with equivocal results. (See Exhibit 4F attached, lab reports). On June 16, 2003, Mr. Niemic tested positive for H. Pylori, with a Helicobacter Pylori IGM of 1.3. On June 23, 2003, the defendants ordered a follow-up test, scheduled to occur in July 2003. (Exhibit 4B).

70.  On July 13, 2003, the H. Pylori test was again positive, and defendant Erdody arranged to treat the ailment with Tetracycline, Flagyl, Pepto Bismol and Pepcid. (Exhibit 4C, sick call request). On August 6, 2003, the defendants renewed plaintiff's Pepto Bismol prescription, and on August 7, 2003, the defendants decreased his Pepcid medication. (Exhibit 4B). On and around this date, UMCH also started Mr. Niemic on Protonix to treat his H. Pylori. (Exhibit 4B, dated October 10, 2003).

71.  Because Mr. Niemic's H. Pylori did not improve by October 6, 2003, on October 12, 2003, defendant Erdody reordered an H. Pylori exam, noting that the results would be discussed with both Dr. Brewer and Dr. Drewniak. (Exhibit 4B; Exhibit 4C, sick call request). It was required that both doctors clear Mr. Niemic before he restarted treatment for his Hepatitis C. (See Exhibit 4D attached, UMCH

consultation request dated October 12, 2003). On December 17, 2003, the LSH clinic re-evaluated the status of plaintiff's H. Pylori. The LSH doctor recommended an H. Pylori biopsy and that plaintiff return to the clinic after he received an endoscopy. (See Exhibit 4E attached, LSH consult requests). Mr. Niemic's endoscopy was performed on February 13, 2004. (Exhibit 4E, upper endoscopy form).

72. Also on February 13, 2004, an antral biopsy revealed that plaintiff's Giemsa stain was negative for H. Pylori. As such, LSH physician, Anjali Andalkar, M.D., concluded that Mr. Niemic did not have H. Pylori. (Exhibit 4E, surgical pathology report).

73. There is no record of further complaints from Mr. Niemic regarding H. Pylori after this date. (Exhibit 4C).

### History of Urinary Treatment
### (See Exhibit 5, A through F)

74. Mr. Niemic first requested a urology appointment on September 17, 2003. (See Exhibit 5C attached, sick call request). In response to this request, the defendants performed a urinalysis on September 22, 2003, which came back negative. (See Exhibit 5B attached, physician orders; Exhibit C, sick call request).

75. When plaintiff requested another urology appointment, on October 6, 2003, defendants examined Mr. Niemic's genitals, which were found to be normal. Nurse Erdody reminded Mr. Niemic, during an evaluation on October 15th, that his urinalysis, taken just a few weeks ago, was negative. (Exhibit 5C, sick call request).

76.  On October 15, 2003, defendant Erdody ordered another urinalysis dip.  These values were within the normal limits.  (See Exhibit 5A attached, progress note dated October 16, 2003; Exhibit 5B).  However, defendant Kern still ordered a urine culture on December 22, 2003.  (Exhibit 5B, dated December 22, 2003).  The urine culture indicated that Mr. Niemic had a pH level of 6.0, which was within normal limits, and that he had a neutral gram positive growth.  (See Exhibit 5F attached, lab reports dated December 23, 2003).

77.  While plaintiff continued to complain about his urine in January 2004, on February 23, 2004, his Chlamydia and Syphilis tests came back negative. (Exhibit 5C; Exhibit 5F).

78.  Even though the plaintiff continued to complain of penile discharge from March of 2004 until the last date listed in his Complaint, June 2004, he repeatedly refused treatment for this ailment.  Specifically, while the defendants tried to assess plaintiff's urinary condition, Mr. Niemic refused a prostate exam on at least four occasions in May and June 2004.  (Exhibit 5C, dated May 6, 2004, May 17, 2005, June 2, 2004, and June 4, 2004).

79.  Dr. Kern explained to Mr. Niemic that his refusals would delay diagnosis of any potential conditions, and that the rectal exam was part of a urology exam. (Exhibit 5A; Exhibit 5C).  However, plaintiff continued to refuse the exam, and he threatened legal action.  (Exhibit 5A, release of responsibility).

80.  When plaintiff stated that he could not urinate on June 4, 2004, the defendants offered to take a straight catheterization.  (Exhibit 5A, progress note & release of responsibility).  When plaintiff refused the catheterization, and tried to give a

sample independently, he could not produce enough urine for the lab test. (Exhibit 5A, progress note dated June 8, 2004).  As such, the defendants continued to offer Mr. Niemic the straight catheterization, so that they could test his urine for abnormalities.  (Exhibit 5B, dated June 9, 2004).

81.    Unfortunately, when the defendants finally obtained a sufficient urine sample, the contents spilled in the transport bag on the way to the lab, and there was nothing left to test for analysis.  (Exhibit 5F, dated June 17, 2004).  As such, defendant Jaiswal re-ordered a witnessed urine sample to be sent to the lab.  (Exhibit 5A, progress note dated June 28, 2004).

82.    Once the urine sample was successfully obtained, the lab results from July 5, 2004 indicated that plaintiff's occult blood urine was 4+, and that the number of red blood cells in his urine was at 62.  Based on these results, UMCH arranged for Mr. Niemic to meet with a doctor on July 12, 2004.  (Exhibit 5A, progress note dated June 28, 2004; Exhibit 5F).  Additionally, another urine culture was performed, which was negative at 14,000 colonies/ML.  (Exhibit 5F, dated July 5, 2004).

83.    On June 28, 2004, the defendants noted that they would scheduled Mr. Niemic for a urology appointment at the LSH; however, to do so, they needed to perform a rectal exam to evaluate plaintiff's condition.  (Exhibit 5C).  Despite their attempts to examine the plaintiff, Mr. Niemic refused the rectal exam on July 8th and again on July 12th.  (Exhibit 5A, release of responsibility; Exhibit 5C).

974594v1

84.    Ultimately, despite the plaintiff's own failure to cooperate, UMCH physician, Dr. Singletary, requested a urology appointment with the LSH urology clinic on August 12, 2004.  (See Exhibit 5D attached, UMCH consult request).

**History of Lymph Node and Cyst Treatment**
**(See Exhibit 5, A through F)**

85.    On and around December 2003, the plaintiff started requesting a lymph node biopsy, to assess a lump in his groin.  (Exhibit 5C, sick call requests dated December 11 and 18, 2003).  In response, on December 22, 2003, Dr. Kern evaluated the lump, diagnosing Mr. Niemic with an inguinal cyst.  Dr. Kern noted that this cyst should be monitored for change.  (Exhibit 5C, sick call request dated December 18, 2003).

86.    While the plaintiff claimed that his lymph node/groin was enlarged, on December 31, 2003, defendant Kern observed that the cyst remained the same size and that plaintiff's groin did not appear enlarged.  (Exhibit 5A).

87.    On January 7, 2004, February 16, 2004, February 19, 2004, March 10, 2004 and March 18, 2004, Mr. Niemic again complained about his inguinal cyst. (Exhibit 5C, sick call request).

88.    On March 18, 2004, Dr. Kern re-evaluated Mr. Niemic's groin and could not locate a palpable node.  The cyst was unchanged from its last review on December 31, 2003.  (Exhibit 5C, sick call request).  Again, on May 6, 2004, defendant Kern re-evaluated plaintiff's inguinal cyst, noting that there was no change in the right groin cyst.  (Exhibit 5C, sick call request).  Dr. Kern prescribed Feldene, instead of Aspirin, to treat the pain.  (Exhibit 5B, dated February 6, 2004; Exhibit 5C).

89.   On May 7th and May 17th, Dr. Kern once again examined the plaintiff's groin, noting both times that the cyst's size had not changed. (Exhibit 5C, sick call request; Exhibit 5D, UMCH consult).  While plaintiff continued to complain of swollen lymph nodes throughout June 2004, the defendants did not note any change in this plaintiff's inguinal cyst.  (Exhibit 5C, sick call request dated June 14, 2004).

## CONCLUSION

Based on the foregoing, there are no material facts in dispute in this case with respect to the defendants, **Stanley Galas, N.P., Arthur Brewer, M.D., June Binney, Jeff Shorey, R.N., Kara Erdody, R.N., Donna Fitzgerald, L.P.N., Donald Kern, M.D., and Gurvinder Jaiswal, M.D.,** and, therefore, the defendants are entitled to judgment as a matter of law on all claims brought by the plaintiff.

Respectfully Submitted,
The Defendants,
STANLEY GALAS, ARTHUR BREWER, M.D.,
JUNE BINNEY, JEFF SHOREY, R.N., KARA
ERDODY, N.P., DONNA FITZGERALD, L.P.N.,
DONALD KERN, M.D. AND GURVINDER
JAISWAL, M.D.
By their attorneys,

I hereby certify that a true copy of the above document was served upon (each party appearing *pro se* and) the attorney of record for each (other) party by mail on this 31st day of January, 2006.

/s/ James A. Bello

/s/ James A. Bello

_____
James A. Bello / Lisa R. Wichter

_____
James A. Bello, BBO #633550
Lisa R. Wichter, BBO #661006
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
(617) 439-7500