UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KEITH NIEMIC, | ) | |
| Plaintiff | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| STANLEY GALAS, ARTHUR BREWER, M.D., | ) | CIVIL ACTION NO. 1:04-CV-11482-NMG |
| JUNE BINNEY, JEFF SHOREY, R.N., | ) | |
| KARA ERDODY, R.N., DONNA | ) | |
| FITZGERALD, L.P.N., DONALD KERN, M.D., | ) | |
| and GURVINDER JAISWAL, M.D., ET AL., | ) | |
| Defendants | ) | |

## AFFIDAVIT OF ARTHUR BREWER, M.D.

I, **ARTHUR BREWER, M.D.**, on oath depose and swear that:

1.    I am licensed to practice medicine in the Commonwealth of Massachusetts.

2.    I am the Program Medical Director for UMass Correctional Health ("UMCH"), and have held this position since January 1, 2003. As Program Director, my duties are generally administrative in nature. While I provide direct treatment to inmates at times, in Mr. Niemic's case, I did not provide him with any direct medical care.

3.    UMCH is the healthcare provider from the Massachusetts Department of Correction ("MDOC") and was the provider for all the Massachusetts prison facilities during the times relevant to this Complaint.

4.    While Mr. Niemic claims that I, along with the other named medical defendants, was deliberately indifferent to his various medical ailments, by failing to diagnose and treat these conditions, the UMCH staff at MCI-Cedar Junction ("MCI-CJ") provided plaintiff with adequate and appropriate medical care, based on the medical reports and plaintiff's medical condition. *(Exhibits 1 through 5)*.

5.    Plaintiff names myself, June Binney, Stanley Galas, Jeff Shorey, R.N., Kara Erdody, R.N., Donna Fitzgerald, L.P.N., Donald Kern, M.D. and Gurvinder Jaiswal, M.D. as medical defendants in this Complaint. All of the above-named individuals, with the exception of June Binney and myself, are UMCH employees, who provided medical treatment to inmates incarcerated at MCI-CJ during the time stated in Mr. Niemic's Complaint.

6.    June Binney was the Program Director for UMCH at all times relevant to this Complaint.

973638v1

**Migraine Treatment** *(See Exhibit 1, A through F)*

7.      Upon review of the medical records, UMCH provided Mr. Niemic with adequate and proper care for his migraine headaches.

8.      Initially, in November 2001, UMCH prescribed the narcotic, Darvon, to treat plaintiff's headache pain.  *(Exhibit 1A, progress note; Exhibit 1B attached, physician order).* It should be noted that there was some reservation about prescribing Darvon, due to the drug's addictive nature.  However, UMCH still prescribed the drug because Mr. Niemic's migraines were severe.  *(Exhibit 1A).*

9.      On December 3, 2001, the plaintiff agreed to change his Darvon prescription to Imitrex. *(Exhibit 1A).*  After it was suspected that the plaintiff had suffered an allergic reaction to the Imitrex, UMCH temporarily treated Mr. Niemic's headaches with Ibuprofen until his appointment with the Lemuel Shattuck Hospital ("LSH") neurology clinic on December 19, 2001.  *(Exhibit 1A, progress note dated December 9, 2001).*

10.     On December 19, 2001, Mr. Niemic was examined by LSH physician, Dr. Drewniak.  On December 20, 2001, UMCH followed Dr. Drewniak's advice, and prescribed Vioxx to treat Mr. Niemic's migraines.  *(Exhibit 1B; Exhibit 1E attached, LSH consultation).* However, because this drug caused plaintiff abdominal pain, UMCH replaced the Vioxx with Fiorinal.  *(Exhibit 1A, dated December 29, 2001).*

11.     Thereafter, in January 2002, Mr. Niemic requested that his Fiorinal be replaced with Darvon.  UMCH refused this request because the DOC pharmacy was concerned about Darvon's addictive nature.  Instead, UMCH prescribed Ultram, and ordered a second LSH consult with the neurology clinic.  *(Exhibit 1A, dated January 5, 2002; Exhibit 1B).*

12.     UMCH treated Mr. Niemic's migraines with Ultram from February 2002 through April 2002.  However, on April 30, 2002, Dr. Kasim Gouda prescribed Midrin, and ordered a neurology consult.  *(Exhibit 1B).*

13.     On May 9, 2002, Mr. Niemic wrote five (5) separate letters to the Health Services Unit ("HSU") demanding Darvon for his migraines.  *(Exhibit 1C attached, plaintiff's grievance).*   When the plaintiff did not receive the Darvon, he became angry. *(Exhibit 1A, dated May 17, 2002).*

14.     However, Mr. Niemic's anger was misplaced, given that just three days earlier, on May 14, 2002, he had been informed that Darvon is not good for patients with liver disease–an ailment which plaintiff suffered as a result of his Hepatitis C.  *(Exhibit 1C, defendants' grievance response, dated May 14, 2002).*

15.     On May 27, 2002, Mr. Niemic received pain management in the HSU, and on May 31, 2002, Dr. Jaiswal ordered a CT scan, with contrast of plaintiff's head, to rule out a tumor or aneurysm.  *(Exhibit 1A; Exhibit 1D attached, UMCH consult request).* On this same date, Dr. Jaiswal noted that the plaintiff was drug/narcotic seeking, refusing to take non-narcotic medication to treat his migraine pain.  *(Exhibit 1A).*

16.    On June 4, 2002, the May 31st head CT scan came back normal. *(Exhibit 1E, LSH consultation).* While UMCH continued to treat the plaintiff's migraines with Fiorinal, Mr. Niemic still demanded narcotic medication and refused any non-narcotic prescriptions. *(Exhibit 1A, dated June 12, 2002).*

17.    Given the plaintiff's continued demands for Darvon medication, on June 6, 2002, I had the HSU explain to Mr. Niemic that UMCH stopped his Darvon prescription because this narcotic could be harmful to his Hepatitis C. *(Exhibit 1C, defendants' grievance response).*

18.    On June 12, 2002, plaintiff's block officer informed Dr. Jaiswal that Mr. Niemic never complained of nausea or headaches while in his cell. *(Exhibit 1A).* Also on this date, Mr. Stringham once again explained to the plaintiff that he was not being treated with Darvon because this drug could negatively affect his liver disease. Instead, Mr. Stringham offered to treat Mr. Niemic's headaches with Tylenol, Motrin, and Naprosyn. *(Exhibit 1C, defendants' grievance response).*

19.    On July 22, 2002, I then wrote a letter to Mr. Niemic directly, discussing the risks involved in taking Darvon. I explained that the pharmacy routinely advises against prescriptions when it is appropriate, as it is in this case. *(Exhibit 1C, defendants' grievance response).*

20.    On August 2, 2002, Mr. Niemic threatened to report Dr. Jaiswal to the Board of Registration in Medicine for abuse, if she did not prescribe him narcotic medication. *(Exhibit 1A).* Dr. Jaiswal confirmed, for a second time, that plaintiff was behaving normally, and showing no signs or symptoms of sickness while in his cell. *(Exhibit 1A).*

21.    In October 2002, UMCH recommended that Mr. Niemic try a relaxation technique to relieve his migraines. *(Exhibit 1C, sick call request).* Additionally, on and around this time, UMCH also prescribed Fiorinal and Robaxin to treat plaintiff's migraines. *(Exhibit 1B).*

22.    On November 21, 2002, I recommended plaintiff for an LSH neurology consult. *(Exhibit 1A).* By March 2003, Mr. Niemic was scheduled to visit the LSH in April 2003. *(Exhibit 1A, dated March 21, 2003).* In the interim, Mr. Niemic's migraines continued to be treated with Robaxin, Fiorinal, and Motrin. *(Exhibit 1B).*

23.    On April 4, 2003, LSH neurologist, Dr. Bharani, prescribed Verapamil and Midrin to treat plaintiff's migraines. Dr. Bharani specifically stated that Mr. Niemic's headaches should <u>not</u> be treated with Ultram or opiates. *(Exhibit 1E, LSH consultation).* When the plaintiff complained that he could not take Midrin, Stanley Galas, N.P. prescribed Axert. *(Exhibit 1D, UMCH consultation).*

24.    On June 6, 2003, during a follow-up neurology consult, Dr. Bharani recommended that this plaintiff try Klonopin for one (1) month. *(Exhibit 1E, LSH consultation).* The medical records indicate that from June 2003 through December 2003, the plaintiff appeared satisfied with his Klonopin and Motrin prescriptions. *(Exhibit 1B; Exhibit 1C).*

3

973638v1

25.   On December 22, 2003, plaintiff's non-focal neurological CT scan came back negative, and Dr. Kern ordered a consult, inquiring as to whether UMCH should discontinue Mr. Niemic's Klonopin and treat his headaches symptomatically. *(Exhibit 1D, UMCH consultation dated December 22, 2003 and February 4, 2004)*. UMCH continued prescribing Klonopin and Motrin while awaiting plaintiff's upcoming neurology appointment. *(Exhibit 1B)*.

26.   On February 27, 2004, Dr. Bharani recommended taking plaintiff off Klonopin. Instead, he suggested treating plaintiff's migraines with Topamax, Zomig, and Indomethacin. In response to this recommendation, Dr. Kern ordered Axert and Indocin, while decreasing plaintiff's Klonopin medication. *(Exhibit 1B; Exhibit 1E, LSH consultation, dated March 1, 2004)*.

27.   On March 22, 2004, Stanley Galas informed Mr. Niemic, via letter, that Dr. Bharani's drug recommendation was satisfied, even though Dr. Kern prescribed Axert rather than Zomig, because the two drugs are similar. Additionally, Stanley Galas noted that it was Mr. Niemic who chose not to follow Dr. Bharani's medical order to take non-narcotics, not UMCH that was denying him treatment. *(Exhibit 1C, defendants' grievance response)*.

28.   On March 29, 2004, UMCH stopped plaintiff's Axert, Indocin, and Topamax, at Mr. Niemic's request, and instead prescribed him Aspirin for his headaches. *(Exhibit 1C, sick call request; Exhibit 1B)*.

29.   On April 2, 2004, Dr. Bharani discontinued plaintiff's Topamax prescription and recommended Celebrex, in hopes that Mr. Niemic could resume his Hepatitis C treatment. *(Exhibit 1E, LSH consultation)*. Dr. Bharani noted that the plaintiff did not need to return to the neurology clinic for another four to six months.

30.   While Mr. Niemic complained that Dr. Kern only ordered Aspirin for his headaches, rather than the Celebrex, Stanley Galas explained that Celebrex is not clinically indicated for headaches, and that it can actually <u>cause</u> headaches. Mr. Galas noted that Mr. Niemic had agreed to an Aspirin drug regimen on March 29, 2004. Mr. Galas still offered plaintiff the opportunity to take Vioxx, a similar drug to Celebrex, if he insisted on following Dr. Bharani's suggestions. *(Exhibit 1C, defendants' grievance response)*.

31.   On May 6, 2004, Dr. Kern requested an appointment with Dr. Bharani for August 2004, and ordered Feldene to replace plaintiff's Aspirin prescription, through July 2004. *(Exhibit 1B, physician order; Exhibit 1D, UMCH consultation request)*. When Mr. Niemic complained that he was dissatisfied with the Feldene drug, UMCH decreased the prescription and ordered Motrin. *(Exhibit 1B; Exhibit 1C, sick call request dated June 4, 2004)*.

32.   Mr. Niemic complained again of headache pain in July 2004. *(Exhibit 1C, sick call request)*. However, according to this plaintiff's medical records, on July 14, 2004,

4

973638v1

Mr. Niemic refused UMCH's offer to diagnose his migraines. Specifically, the plaintiff refused to visit with an eye doctor to assess the possible cause of his headaches. *(Exhibit 1A, release of responsibility).*

**History of Hepatitis C Treatment** *(See Exhibit 2, A through F)*

33.  Mr. Niemic was diagnosed with Hepatitis C on May 3, 1999. *(Exhibit 2A, Hepatitis C confidential case report).* The Hepatitis was treated intermittently, with Pegylated/ Interferon and Ribavirin therapy, during the dates relevant to this Complaint. However, because Mr. Niemic repeatedly complained that the combination therapy increased the severity of his migraines, and because Mr. Niemic used illegal drugs while taking this combination therapy, plaintiff's combination therapy intake was not continuous. *(Exhibit 2A; Exhibit 2C).*

34.  When plaintiff's LFT levels were abnormally high, on and around June 2001, UMCH sent Mr. Niemic to LSH physician, Dr. Drewniak, on July 3, 2001 for an evaluation. Additionally, Mr. Niemic received a liver biopsy on August 27, 2001. *(Exhibit 2E, LSH consultation dated December 19, 2001; Exhibit 2F attached, lab report).*

35.  On November 7, 2001, the status post on plaintiff's liver biopsy came back normal. As such, UMCH recommended that plaintiff return to the clinic in three (3) months. *(Exhibit 2A).*

36.  As of December 19, 2001, Dr. Drewniak felt that Mr. Niemic was a good candidate for Interferon/Ribavirin treatment, and recommended treatment with these drugs. *(Exhibit 2E, LSH consultation).* On December 20, 2001, UMCH ordered Interferon and Ribavirin to treat Mr. Niemic's Hepatitis C. *(Exhibit 2B).*

37.  Ten (10) days after UMCH's initial prescription, on December 29, 2001, Mr. Niemic complained that the Interferon and Ribavirin injections caused serious flu-like symptoms, and magnified his migraine pain. *(Exhibit 2A); Complaint, ¶24.* However, as of February 15, 2002, plaintiff only had mild side effects from taking the Interferon and Ribavirin drugs. *(Exhibit 2A).*

38.  On March 27, 2002, Kasim Gouda, M.D. ordered an HCV RNA test, noting that the drug therapy should not be continued unless Mr. Niemic was responding to the Hepatitis C drug regimen. Dr. Gouda recommended that plaintiff return to the clinic for another evaluation in two (2) months. *(Exhibit 2E, LSH consultation).*

39.  As of April 4, 2002, plaintiff's HCV RNA was less than 600, his Hepatitis C viral RNA was less than 1000, and his LFT's were within the normal range. *(Exhibit 2F, Quest diagnostic and lab report).* Based on these labs, plaintiff's Hepatitis C drug therapy was renewed. *(Exhibit 2B, dated April 5, 2002).*

40.  In May 2002, plaintiff's LFT's were within the normal range. *(Exhibit 2F).* However, because Mr. Niemic claimed that his headaches were worsening, Dr. Jaiswal requested

5

another CD visit, to re-evaluate the Hepatitis C drug therapy. *(Exhibit 2A, dated May 24, 2002; Exhibit 2D, UMCH consultation request dated May 31, 2002); Complaint, ¶30.*

41.    Contrary to Mr. Niemic's allegations, he was not forced to give up his liver treatment due to improper migraine management. In fact, Mr. Niemic's June and July 2002 medical records clearly indicate that it was this plaintiff who refused to take his Interferon medication. *(Exhibit 2A, release of responsibility dated June 28, 2002; Exhibit 2D, UMCH consult request dated June 8, 2002); Complaint, ¶33.* Despite his refusals, in July 2002, UMCH still prescribed Ribavirin and Interferon for Mr. Niemic's Hepatitis C. *(Exhibit 2B; Exhibit 2C, dated July 16, 2002).*

42.    As of July 21, 2002, plaintiff's HCV RNA was reported at less than 550. *(Exhibit 2F).* Dr. Drewniak noted, on July 23rd, that there was a high probability that plaintiff's HCV would relapse in six (6) months, if he continued to refuse his Hepatitis C treatments. *(Exhibit 2E).* Dr. Drewniak suggested that if plaintiff chose to stop taking the drug therapy, he should return to the LSH clinic in six (6) months to re-evaluate his Hepatitis C. *(Exhibit 2E).*

43.    On August 2, 2002, Mr. Niemic had stopped taking his Hepatitis drug treatment to manipulate UMCH's willingness to prescribe narcotics. *(Exhibit 2A).* Thereafter, in September 2002, UMCH decreased plaintiff's Interferon and Ribavirin treatments and ordered another HCV RNA viral load test. *(Exhibit 2B, dated September 20, 2002; Exhibit 2F, dated September 27, 2002).* On September 29, 2002, Mr. Niemic's BDNA was undetectable, at less than 550. *(Exhibit 2A, release of responsibility; Exhibit 2F).*

44.    On November 9, 2002, UMCH re-checked plaintiff's viral load, noting that plaintiff had responded well to the discontinuation of his Hepatitis C therapy. UMCH noted it would re-check Mr. Niemic's LFT's and viral load in December 2002. *(Exhibit 2A).*

45.    As of December 20, 2002, plaintiff's LFT's were still within the normal range, and his HCV RNA quantity was steady at 1406. *(Exhibit 2F).* When Mr. Niemic notified Dr. Jaiswal that he wished to restart the Interferon treatment, on February 27, 2003, she planned to discuss this plaintiff's Interferon treatment with a GI physician. *(Exhibit 2A).*

46.    However, when Mr. Niemic's HCV RNA viral load increased to 101879 on May 30, 2003 (a number well above the 550 level), Dr. Jaiswal ordered a Pegylated Interferon form and a GI consult for Mr. Niemic. *(Exhibit 2B, dated July 7, 2003; Exhibit 2F, dated June 16, 2003).* As of August 2, 2003, Mr. Niemic was scheduled to visit the LSH GI clinic in December 2003. *(Exhibit 2C, sick call request).*

47.    On September 8, 2003, plaintiff was found unconscious in his cell. *Complaint, 49.* He had needle marks on his arms, his pupils were constricted, and a DOC test came back positive for heroin and cocaine. *(Exhibit 2A).*

48.    If a patient tests positive for illegal drugs, I discuss the case with the GI clinic, and determine whether to delay Hepatitis C treatment for a period of twelve (12) months.

6

973638v1

*(Exhibit 2C, letter from Galas to plaintiff dated September 25, 2003; memo from Galas to Allen dated October 17, 2003).*

49.     In Mr. Niemic's case, on and around September 29, 2003, Dr. Drewniak and myself discussed plaintiff's viral load, and jointly agreed with the GI clinic to delay Hepatitis treatment for one (1) year. We still ordered UMCH to monitor Mr. Niemic's LFT's during this year-long period. *(Exhibit 2C, sick call request and letter from Stanley Galas to Allen, dated October 14, 2003; Exhibit 2F).*

50.     As of October 2003, Mr. Niemic's LFT's were returning to the normal range. *(Exhibit 2F).* On December 17, 2003, the UMCH Chronic Disease ("CD") clinic's Dr. Kern ordered a follow-up LFT test for February 2004. *(Exhibit 2A; Exhibit 2B).* When Mr. Niemic's LFT's were slightly elevated, on February 16, 2004, UMCH re-sent Mr. Niemic to the CD clinic for an evaluation, where the staff noted that plaintiff did not exhibit new symptoms of Hepatitis C. *(Exhibit 2A; Exhibit 2F).*

51.     On June 4, 2004, Mr. Niemic refused a CD visit for an evaluation of his Hepatitis C. *(Exhibit 2C).* On June 21, 2004, plaintiff's LFT's were found to be within the normal range. *(Exhibit 2C, sick call request; Exhibit 2F, dated July 21, 2004).* While plaintiff once again requested liver treatment in June 2004, Stanley Galas reminded Mr. Niemic on June 22, 2004 that he needed to be clear from illegal substances for one year before he would be considered for Interferon treatment. *(Exhibit 2C, letter from Galas to plaintiff dated June 22, 2004).*

**History of Chest Pain Treatment** *(See Exhibit 3, A through F)*

52.     The medical records also clearly demonstrate that the UMCH staff at MCI-Cedar Junction provided Mr. Niemic with proper medical care for his chest pains. Plaintiff began to complain of chest pain on November 12, 2001, on December 25, 2001 and on January 19, 2002. *(Exhibit 3B, dated January 22, 2002; Exhibit 3C, sick call request and letter from plaintiff).* In response, UMCH ordered an EKG and checked plaintiff's blood pressure. *(Exhibit 3C, letter from plaintiff).*

53.     UMCH doctors were concerned that Mr. Niemic's chest pain was related to his Interferon intake, or a separate medical condition. Given this concern, UMCH prescribed Baby Aspirin to treat plaintiff's chest pain. *(Exhibit 3A; Exhibit 3B, dated January 24, 2002).*

54.     On February 5, 2002, UMCH treated plaintiff's chest condition with Motrin. A review on February 15, 2002 indicated that Mr. Niemic's chest and lungs were clear, and he had a negative resting respiratory rate. *(Exhibit 3A).*

55.     On March 4, 2002, UMCH ordered another EKG and prescribed Motrin. *(Exhibit 3B; Exhibit 3C, sick call request).* When Mr. Niemic notified UMCH of chest pain on July 5, 2002, a UMCH doctor evaluated plaintiff's sternum, noting that it was not radiating. The doctor ordered an EKG and advised the staff to monitor the plaintiff while in his cell.

973638v1

*(Exhibit 3A).* Mr. Niemic was also given Tylenol and periodic blood pressure checks on this date, and he seemed happy when he left the HSU. *(Exhibit 3A; Exhibit 3B).*

56.     On July 29, 2002, the UMCH staff ordered a regular sinus rhythm, a CTA, and prescribed Aspirin. *(Exhibit 3A; Exhibit 3B).* While Mr. Niemic's chest pain disappeared from August 2002 through April 2003, plaintiff once again complained of shortness of breath and chest pain on May 6, 2003. Upon complaint, Dr. Jaiswal checked plaintiff's blood pressure, which was elevated to 126/96. The rest of the plaintiff's chest exam was unremarkable. *(Exhibit 3C, sick call request dated May 7, 2003).*

57.     Mr. Niemic did not have another bout of chest pain for several months, until December 28, 2003. *(Exhibit 3A).* This plaintiff refused UMCH's offer of a hospital evaluation and Motrin medication for his pain. Mr. Niemic told the nurse to go away and that he was fine. *(Exhibit 3A).*

58.     Contrary to this plaintiff's claim that Dr. Kern ignored his complaints of chest pain on March 30, 2004, there are no medical records indicating that Mr. Niemic filed any complaints for chest pain on or around this date. *(Exhibit 3C).* In fact, the medical records indicate that plaintiff did not complain again of chest pain on any other dates listed in his Complaint (through August 2004). *(Exhibit 3C).*

**History of H. Pylori Treatment** *(See Exhibit 4, A through F)*

59.     While plaintiff's Complaint alleges that medical mistreatment of his H. Pylori started in 2001, Mr. Niemic did not test positive for H. Pylori until June 16, 2003.

60.     On May 12, 2003, UMCH ordered Mr. Niemic an H. Pylori test. *(Exhibit 4A; Exhibit 4C, sick call request).* UMCH also prescribed Pepto-Bismol for this plaintiff's stomachaches. *(Exhibit 4A; Exhibit 4B).*

61.     On May 17, 2003, the H. Pylori test came back with equivocal results. *(Exhibit 4F).* However, a June 16, 2003 test showed Mr. Niemic was positive for H. Pylori, with an IGM of 1.3. *(Exhibit 4F).* On June 23, 2003, UMCH ordered a follow-up test for July 2003, which was again positive for H. Pylori. Nurse Erdody arranged to treat the ailment with Tetracycline, Flagyl, Pepto-Bismol and Pepcid. *(Exhibit 4B, Exhibit 4C, sick call request).*

62.     On August 6, 2003, UMCH renewed plaintiff's Pepto-Bismol prescription, prescribed Protonix, and decreased this patient's Pepcid medication. *(Exhibit 4B, dated August 7, 2003).* Because Mr. Niemic's H. Pylori did not improve by October 6, 2003, Kara Erdody, R.N. reordered an H. Pylori exam, noting that the results would be discussed with both Dr. Brewer and Dr. Drewniak. *(Exhibit 4B; Exhibit 4C, sick call request dated October 12, 2003).* It was required that both doctors clear Mr. Niemic before he restarted treatment for his Hepatitis C. *(Exhibit 4D, UMCH consultation request dated October 12, 2003).*

973638v1

63. On December 17, 2003, the LSH clinic recommended an H. Pylori biopsy and that plaintiff return to the clinic after he received an endoscopy. *(Exhibit 4E)*. Mr. Niemic's endoscopy was performed on February 13, 2004. *(Exhibit 4E, upper endoscopy form)*. Also on February 13, 2004, an antral biopsy revealed that plaintiff's Giemsa stain was negative for H. Pylori. It was at this point that LSH physician, Anjali Andalkar, M.D., concluded that Mr. Niemic did not have H. Pylori. *(Exhibit 4E, surgical pathology report)*.

**History of Urinary Treatment** *(See Exhibit 5, A through F)*

64. Mr. Niemic first requested a urology appointment on September 17, 2003. UMCH performed a urinalysis on September 22, 2003, which came back negative. *(Exhibit 5B; Exhibit 5C, sick call request)*.

65. When plaintiff requested another urology appointment, on October 6, 2003, Kara Erdody examined this patient's genitals to assess Mr. Pine's urinary condition. They were normal, and Nurse Erdody reminded Mr. Niemic that his urinalysis, taken just a few weeks ago, was negative. *(Exhibit 5C, sick call request)*.

66. On October 15, 2003, Nurse Erdody ordered another urinalysis dip. These values were within the normal limits. *(Exhibit 5A; Exhibit 5B, dated October 16, 2003)*. Additionally, on and around December 2003, Dr. Kern ordered a urine analysis. *(Exhibit 5B, dated on December 22, 2003)*. The urine analysis indicated that Mr. Niemic had a pH level of 6.0 was within the normal limits, and that he had neutral gram positive growth. *(Exhibit 5F, dated December 23, 2003)*.

67. While Mr. Niemic continued to complain about his urine in January 2004, a February 23, 2004 Chlamydia culture came back negative. *(Exhibit 5C; Exhibit 5F)*.

68. While plaintiff continued to complain of penile discharge from March of 2004 until the last date listed in his Complaint (June 2004), he repeatedly refused treatment for this ailment–refusing prostate exams on at least four occasions in May and June 2004. *(Exhibit 5C, Exhibit 5D, dated May 6, 2004, May 17, 2004, June 2, 2004, and June 4, 2004)*. Dr. Kern explained to Mr. Niemic that his refusals would delay diagnosis of any potential conditions, and that the rectal exam was part of a urology exam. *(Exhibit 5A; Exhibit 5C)*. However, plaintiff continued to refuse the exam, threatening legal action. *(Exhibit 5A, release of responsibility)*.

69. When Mr. Niemic stated that he could not urinate on June 4, 2004, UMCH offered to take a straight catheterization. *(Exhibit 5A, progress note and release of responsibility)*. While plaintiff refused the catheterization, and tried to give a sample independently, he could not produce enough urine for the lab test. *(Exhibit 5A, progress note dated June 8, 2004)*. In response, the UMCH staff offered Mr. Niemic the straight catheterization. *(Exhibit 5B, dated June 9, 2004)*.

9

973638v1

70.     Due to a mishap, when UMCH finally did obtain a sufficient urine sample, the contents spilled in the transport bag on the way to the lab, and there was nothing left to test for analysis. *(Exhibit 5F, dated June 17, 2004).* Dr. Jaiswal re-ordered a witnessed urine sample to be sent to the lab, and when the urine sample was successfully obtained, lab results, dated July 5, 2004, indicated that plaintiff's occult blood urine was 4+, and that the number of red blood cells in his urine was at 62. Based on these lab results, UMCH scheduled Mr. Niemic to be seen by a doctor on July 12, 2004 *(Exhibit 5A, progress note dated June 28, 2004; Exhibit 5F).* Another urine culture was performed, which was negative at 14,000 colonies/ML. *(Exhibit 5F, dated July 5, 2004).*

71.     UMCH noted that in order to schedule a urology appointment at the LSH, they needed to perform a rectal exam to evaluate plaintiff's condition. *(Exhibit 5C, dated June 28, 2004).* Despite their explanations and efforts, however, this plaintiff still refused the rectal exam on two separate occasions in July. *(Exhibit 5A, release of responsibility dated July 8 and July 12, 2004; Exhibit 5C).* Ultimately, on August 12, 2004, UMCH physician, Dr. Singletary, requested a urology appointment with the LSH urology clinic. *(Exhibit 5D).*

**History of Lymph Node and Cyst Treatment** *(See Exhibit 5, A through F)*

72.     On and around December 2003, the plaintiff started requesting a lymph node biopsy, to assess a lump in his groin. *(Exhibit 5C, sick call requests dated December 11 and 18, 2003).* On December 22, 2003, Dr. Kern evaluated the lump, diagnosing Mr. Niemic with an inguinal cyst, and recommending the cyst be monitored for change. *(Exhibit 5C, sick call request, dated December 18, 2003).*

73.     While the plaintiff claims that his groin was enlarged, the medical records indicate that the cyst remained the same size and that plaintiff's groin was not enlarged. *(Exhibit 5A, dated December 31, 2003).*

74.     On March 18, 2004, Dr. Kern re-evaluated Mr. Niemic's groin, and could not locate a palpable node. The cyst was unchanged. *(Exhibit 5C, sick call request).* Again, on May 6, 2004, Dr. Kern evaluated plaintiff's cyst, noting no change. *(Exhibit 5C, sick call request).* Dr. Kern prescribed Feldene to treat Mr. Niemic's pain. *(Exhibit 5B).*

75.     On May 17, 2004, Dr. Kern once again examined the plaintiff's groin, noting both times that the cyst's size had not changed. *(Exhibit 5C, sick call request; Exhibit 5D, UMCH consult).* While plaintiff continued to complain of swollen lymph nodes throughout June 2004, UMCH did not note any change in this plaintiff's inguinal cyst. *(Exhibit 5C, sick call request dated June 14, 2004).*

**Conclusion**

76.     Based on Mr. Niemic's extensive medical records, dating from 1999 through 2004, it is clear that the staff at UMCH provided this patient with proper and adequate medical treatment for his various medical ailments. When Mr. Niemic requested treatment,

973638v1

UMCH evaluated his condition and responded properly.  When outside referrals were necessary, UMCH ordered consults and deferred to the specialists' recommendations. Given these facts, UMCH did not ignore or mistreat Mr. Niemic's serious medical needs.

77.     All the above statements are true and accurate and are based upon my personal knowledge.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _____**

**DAY OF _____, 2006.**

_____
Arthur Brewer, M.D.

11

973638v1