UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KEITH NIEMIC,
Plaintiff

VS.

STANLEY GALAS, ARTHUR BREWER, M.D., JUNE BINNEY, JEFF SHOREY, R.N., KARA ERDODY, R.N., DONNA FITZGERALD, L.P.N., DONALD KERN, M.D., and GURVINDER JAISWAL, M.D., ET AL.,
Defendants

CIVIL ACTION NO. 1:04-CV-11482-NMG

**AFFIDAVIT OF ARTHUR BREWER, M.D.**

I, **ARTHUR BREWER, M.D.,** on oath depose and swear that:

1. I am licensed to practice medicine in the Commonwealth of Massachusetts.

2. I am the Program Medical Director for UMass Correctional Health ("UMCH"), and have held this position since January 1, 2003. As Program Director, my duties are generally administrative in nature. While I provide direct treatment to inmates at times, in Mr. Niemic's case, I did not provide him with any direct medical care.

3. UMCH is the healthcare provider from the Massachusetts Department of Correction ("MDOC") and was the provider for all the Massachusetts prison facilities during the times relevant to this Motion for a Temporary Restraining Order and Preliminary Injunction.

4. While Mr. Niemic claims that I, along with the other named medical defendants, was deliberately indifferent to his head wounds and herniated disc, by failing to diagnose and treat these conditions, the UMCH staff at MCI-Cedar Junction ("MCI-CJ") provided plaintiff with adequate and appropriate medical care, based on the medical reports and plaintiff's medical condition. (Exhibits 1, 2, and 3).

5. Plaintiff names myself, June Binney Stanley Galas, Jeff Shorey, R.N., Kara Erdody, R.N., Donna Fitzgerald, L.P.N., Donald Kern, M.D., and Gurvinder Jaiswal, M.D. as medical defendants in the complaint underlying this Motion for Temporary Restraining Order/ Preliminary Injunction. All of the above-named individuals, with the exception of June Binney and myself, are UMCH employees, who provided medical treatment to inmates incarcerated at MCI-CJ during the time stated in Mr. Niemic's complaint.

6. The plaintiff's medical records indicate that none of the medical defendants mentioned in Paragraph 5, including myself or June Binney, provided Mr. Niemic with medical care from June 2005 through the present.

7. Regarding plaintiff's head wounds, on June 13, 2005, when Mr. Niemic was brought down to MCI-CJ's Health Service Unit ("HSU"), the medical staff applied nylon sutures on his two large head lacerations, and treated the plaintiff's pain with lidocaine. (Exhibit 1, progress note).

8. On June 23, 2005, the MCI-CJ staff removed Mr. Niemic's sutures, and his wounds were found to be clean and dry. (Exhibit 1).

9. When the plaintiff requested his wounds be reviewed on July 2, 2005, Dr. Augustin Enaw examined the lacerations on July 11, 2005, and noted that the wounds were not infected. (Exhibit 1, progress note).

10. Mr. Niemic's sought-after relief focuses on his herniated disc. Specifically, the plaintiff requests that I arrange an appointment for him with a neuro specialist, and then I order that he either be provided with physical therapy or surgery to repair his movement.

11. As Program Director of UMCH, my job is to oversee the medical decisions made by the staff at each prison facility. However, I generally do not personally treat individual prisoners, nor do I interfere with their treatment, unless policy or treatment renders it necessary to do so. In Mr. Niemic's case, the medical records indicate that the medical staff at MCI-CJ provided Mr. Niemic with outside medical consultations when appropriate, and that the staff at MCI-CJ also treated the plaintiff's back pain with the proper pain medication.

12. During his incarceration at MCI-CJ, Mr. Niemic complained of back pain on July 2, 2005. (Exhibit 1, sick call request). On July 9 and July 11, 2005, the medical defendants prescribed him with Motrin, Toradol and Percocet to treat his pain, until his back could be reviewed by an outside specialist. (Exhibit 1, physician orders).

13. On July 12, 2005, Greystone Radiology Associates reported on plaintiff's three lumbar spine views. The findings indicated that there was no evidence of compression fracture, narrowed disc space, or significant degenerative disease. There were no lesions seen, and the views of Mr. Niemic's *lumbar spine were normal.* (Exhibit 2, outside medical records).

14. Even though plaintiff's lumbar spine appeared normal, a view of the plaintiff's cervical spine revealed that there was localized lower cervical spondylosis and degenerative joint disease at the C6-7 level, despite the fact that there was no evidence of fracture or subluxation seen. (Exhibit 2).

15. In response to the abnormal report, on July 12, 2005, MCI-CJ's nurse practitioner, May Votock, requested an MRI of plaintiff's lumbar spine, at the Lemuel Shattuck Hospital ("LSH"), to further evaluate Mr. Niemic's back pain. (Exhibit 3 attached, UMCH specialty referral request).

16. While the MRI was pending, on July 12th and then July 18th, MCI-CJ's physician, Dr. Carl Singletary, prescribed the plaintiff Motrin, Robaxin, Percocet, Toradol injections, and Ultram to treat the his lower back pain. (Exhibit 1, physician orders).

17. Mr. Niemic was then sent to the New England Medical Center on July 25, 2005. Refeeque Bhadelia, M.D. reviewed Mr. Niemac's lumbar spine and found that, at the L4-5 level, Mr. Niemic had disc herniation on the right side, extending superiorly to the right lateral recess of

959628v1

Mr. Niemic had disc herniation on the right side, extending superiorly to the right lateral recess of L4, and extending to the right L4-5 neural foramen. (Exhibit 2). Dr. Bhadelia was concerned that plaintiff's disc herniation could irritate his L4 nerve root. (Exhibit 2).

18. Mr. Niemic was transferred from MCI-CJ to the Souza Baranowski Correctional Center ("SBCC") on July 26, 2005, one day after MCI-CJ's medical staff learned of his disc herniation diagnosis. One day of notification regarding his diagnosis is not enough time to treat Mr. Niemic for a herniated disc. (Exhibit 1, intrasystem transfer form).

19. After reviewing Mr. Niemic's medical records, on July 26th, SBCC's physician, Dr. Paul Tavares, prescribed Ultram, and Angela D'Antonio, R.N. continued plaintiff's current medicine regimen. (Exhibit 1, physician order and sick call request). Additionally, on July 28, 2005, Nurse D'Antonio prescribed Mr. Niemic Robaxin for his back spasms, and continued plaintiff's Ultram taper. (Exhibit 1, physician order).

20. On August 2, 2005, Nurse D'Antonio requested a neurosurgical consult evaluation at New England Medical Center to review Mr. Niemic's right disc herniation. (Exhibit 3). While this consult was pending, Dr. Tavares and Nurse D'Antonio prescribed the plaintiff Ultram. (Exhibit 1, physician order).

21. On August 6, 2005, Mr. Niemic requested crutches to assist in ambulation when showering. (Exhibit 1, sick call request). In response, Nurse D'Antonio requested that plaintiff meet with Dr. Tavares to discuss the crutches because crutches are not usually used to assist with back pain, and because Mr. Niemic did not appear to have any difficulty walking. (Exhibit 1, progress note).

22. On August 10, 2005, Dr. Tavares met with Mr. Niemic, who requested an increase in his Ultram medication, or else an oxycodone prescription. Dr. Tavares was understandably concerned over these medication requests, especially given that the plaintiff also suffered from Hepatitis C. Additionally, Dr. Tavares advised against using crutches, as they would harm Mr. Niemic's back even more. (Exhibit 1, progress note).

23. The plaintiff's medical records indicate that the medical staff at MCI-Cedar Junction treated Mr. Niemic's head wound and back pain in the appropriate manner. Given these facts, along with the fact that Mr. Niemic is awaiting a neuro surgical consult, it is my recommendation that additional medical care is not necessary because the plaintiff is already receiving the appropriate treatment for his herniated disc.

24. All the above statements are true and accurate and are based upon my personal knowledge.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY**

**THIS** 30 **DAY OF** August**, 2005.**

[signature]

Arthur Brewer, M.D.

959628v1

EX 4

# AFFIDAVIT OF DANIEL MASON

I Daniel Mason hereby depose and state that the following is a true statement of facts to the best of my knowledge and memory:

1. I Daniel Mason, do have personal knowledge of the facts set forth herein and can testify to such in a court of law.

2. I have a B.A. from Dartmouth College, where I completed a pre-medical curriculum, with five years medical school experience gained on rotations as a medical student at Boston University Hospital, Boston City Hospital (both have merged and now called the Boston Medical Center), Boston VA Hospital, Franciscan Children's Hospital and North Shore Hospital.

3. I completed most all of the medical school curriculum successfully including but not limited to the following courses and clinical rotations; chemistry, pharmacology, microbiology, physiology, pathology, histology, gross anatomy, infectious disease, neurology, epidemiology and medical ethics, in which I was directly involved in the treatment and care of thousands of patients for over two years as a member of many hospital medical teams, including patients with in factious diseases such as hepatitis, specifically types A, B and C, and their genotypes.

4. Two weeks prior to finding out if my residency would be in Emergency Medicine, or Surgery, and two months prior to my graduation in May 2001, I was arrested and convicted in the Massachusetts Department of Corrections.

5. In clarification of the factual assertions set forth herein, I will make reference to the following authorities as a footnote, abbreviated as (fn. & no.) As chronologically listed: Numbers 1 through 9 footnotes.

---

1.Neuman AV, Lam NP, Dahari H, et al Differences in Viral Dynamics between Genotypes 1 and 2 of Hepatitis C Virus. J Infectious Disease 2000; 182:28-35

2. Schevr PJ. Classification of chronic viral hepatitis: a need for reassessment J Hepatol 1991:13:372-4

3. Italian Association for the study of the liver. Guidelines: online final statement. (Accessed May 31, 2005, at http://www.webaisf.org

4.Alessandra Mangia et al. Peginterferon Alfa-2b and Ribavarin for 12 vs. 24 weeks in HCV Genotype 2 or 3. New England Journal of Medicine 2005:352,No.25: 2609-17

5. Hepatitis C – Complete Health Information regarding HCV on Medicine Net.com, at http://www.medicinenet.com (accessed November 3, 2005) Medical Author: Tse-Ling Fong, M.D., Medical Editor: Leslie J. Schoenfield, M.D., Ph.D.

6. Ishak K, Baptista A, Bianchi L, et al. Histological grading and staging of chronic hepatitis. J Hepatol 1995:22:696-9.

7. McHutchinson JG, Manns M, Patel K, et al. Adherence to combination therapy enhances sustained response in genotype 1 infected patients with chronic hepatitis c. Gastroenterology 2002:123:1061-9

8. Zeuzem S, Pawlotsky JM, Hagai E, et al. International, muticenter, randomized, controlled study comparing standard verses dynamically individualized treatment in patients with chronic hepatitis c (DITTO-HCV project). Hepatology 2003; 38:310A abstract.

9. Fried MW, Schiffman ML, Reddy KR, et al. Peginterferon alfa-2a plus ribavarin for chronic hepatitis c virus infection. New England Journal of Medicine 2002:347:975-82

6. Fiorinal contains butalbital, aspirin and caffeine and is a strong non-narcotic pain reliever and muscle relaxant, is prescribed for the relief of tension headaches symptoms caused by stress… Thomson V Physicians Desk reference 2nd Edition Drug Guide for Mental Health Professionals, page 535. Fioricet contains butalbital acetaminophen and caffeine and is a non-narcotic pain reliever and muscle relaxant, Thomas PDR 2nd Ed. Pg. 534.

7. Midrin, containing isometheptene, dichloralphenazone, and acetaminophen and is prescribed for treatment of tension headaches… "Thomson PDR 2nd Ed. Pg 567"… chronic use of acetaminophen is associated with liver damage acute acetaminophen overdose can potentially result in fatal liver toxicity…"Thomson PDR 2nd Ed. Pg 337.

8. There are several genotypes of Hepatitis C (Hep C) and genotype 1a is generally known as the most virulent (as opposed to genotypes 2&3). (*fn 1,2,3,4).

9. The progression of chronic Hep C infection is based upon estimates generalized from numerous retrospective & prospective studies (*fn 5). Generally, it takes 10 – 14 years from when Hep C is contracted until evidence of chronic Hep C is seen on biopsy, 20 years to develop cirrhosis and 28 years to develop liver cancer (barring factors that can accelerate this process). This is based on retrospective studies. (*fn 5).

10. Prospective studies suggest that 10-25% of Hep C patients develop cirrhosis within 10-15 years, while only 10% of chronic Hep C patients develop symptoms related to their liver disease. (*ft 5).

11. The combination of retrospective and prospective studies suggests a natural progression of the disease is slow and that generally complications develop over decades. (*fn 5.6).

12. Retrospective/prospective studies suggest that once cirrhosis is established the risk of developing complications of liver failure grow at a rate of about 10% per year. (*fn 5,6,2,3). And the risk of developing liver cancer grows at a rate of 1.4% per year. (*fn 5.6).

13. For patients without complications from cirrhosis the 10-year survival rate is about 80%, while for those with such complications the rate is less then 50% at 5 years (*fn 5). Put differently, 20 out of 100 patients will die within 10 years, and 50 out of 100 patients will dies within 5 years respectively.

14. The level of virus in the blood (Viral load) does not correlate with disease severity. (*fn 5). Severe disease may show a low viral load.

15. Combination therapy of interferon and a nucleoside analogue are currently the mainstay of treatment in the U.S.A. (*fn 9,8,7,5,4,3) and is still the standard of care (*fn 5) and are more effective especially with genotype 1 (*fn 9,8,7,5,4,3).

16. The sustained response (SR) of combination therapy for patients with the Hep C genotype 1 is 30% (half of the SR of genotypes 2 or 3). (*fn 5). This further emphasizes the virvliance and need for treatment for patients with genotype 1.

17. The (SR) is the ongoing desired effect of treatment after the completion and cessation of treatment as measured by the patient's blood viral load.

18. In contrast to patients with genotypes 2 &3, those with genotype 1 benefited from 48 weeks (as opposed to only 24) of treatment and it appears to include those genotype 1 patients with low viral loads. (*fn 9,8,7,5,4,3). Again, this further emphasizes the virulence of genotype 1 (since it requires twice the treatment time of genotypes 2&3 to achieve SR), and it benefits genotype one's with low viral load, which suggests a benefit to early treatment.

19. The predictors for a SR involve factors such as the genotype of the virus, the viral load in the blood, the microscopic appearance of the liver tissue (fibrosis & severity thereof), and certain patient characteristics such as:

    - Genotype
    - Viral load below 2 million copies/ml
    - Absence of cirrhosis
    - Female gender
    - Age less than 40 years

    (*fn 5.3)

20. Patients receiving combination therapy should have a qualitative Hep C virus RNA PCR (Polymerase Chain Reaction) measured at 24 weeks and if they are positive for the virus should only then stop treatment as this is predictive of little chance of achieving a SR, (*fn 5,4).

21. Any individual with chronic Hep C infection is a candidate for antiviral therapy; however in weighing the risks and benefits of treatment the National Institute for Health (NIH) consensus development conference recommends treatment for those patients at greatest risk for cirrhosis. These patients have the following characteristics.

    - Persistent ALT elevation
    - Detectable Hep C virus RNA
    - Evidence of fibrosis or biopsy of liver
    - Evidence of moderate inflammation and liver well injury on liver biopsy. (*fn5,3,6)

22. A person can have significant underlying liver disease with Hep C; yet have no symptoms, abnormal laboratory findings, or abnormal physical findings. (*fn 5).

23. Liver biopsy provides information of severity and, therefore the outcome (prognosis) of the aforementioned liver disease. (*fn 5,6,3,)

24. Liver biopsy can provide information of a predictive value as to whether a person is likely to progress to cirrhosis within 10 years (8fn 5.6.3).

25. Consequently, liver biopsy can help determine the risk benefit assessment of starting antiviral therapy (*fn 5). However, not all liver specialists agree that liver biopsy is necessary or required prior to starting therapy, and this provides for the start of said therapy for patients who otherwise (i.e. other than biopsy) are suitable canidates for treatment without biopsy (Fn.5)

26. One would not treat the following individuals with antiviral therapy:
    - Active users of illicit drugs
    - Active users of alcohol
    - Patients with major depression
    - Patients with low blood counts
    - Patients with untreated thyroid disease
    - Patients with autoimmune disease
    - Recipients of solid organ transplants
    - Other serious medical conditions
    - (*fn 5)

27. Essentially, antiviral treatment for chronic Hep C should be tailored to the individual with careful consideration of the risks and benefits (*fn 5).

28. Side effects of combination therapy are unpleasant and common. (*fn 5,8,3). Among those side effects approximately 25-35% suffer from headaches (*fn 5,4,8) and alone or in combination with other side effects causes approximately 10% of patients to discontinue antiviral therapy (*fn 5,4)

29. The liver acts essentially as a detoxifier in relation to chemicals that are produced in or otherwise introduced into the human body. It can perform this task for thousands of chemicals when the liver is healthy. However, when overburdened, even a healthy liver can sustain damage and varying degrees of decreased ability to perform its critical chemical tasks. How much more so for patients with liver diseases such as chronic Hep C virus. In such patients the definition of a hepatotoxin becomes greatly narrowed, and infinitely greater care and consideration must be given to protect the liver from substances that in the context of their disease can be damaging or even fatal.

30. Among such substances contraindicated and should be avoided for such patients are alcohol as well as Tylenol and Motrin and substances that cause the activation of the liver's cytochrome P450 system. Activation of the cgt. P450 system is not entirely avoidable as it's a part of the livers "normal" functions. However, such activation can and must be dramatically reduced wherever possible, and what's more, if such activators are ever purposely introduced for medical purposes it should only be done in absence of an alternative and as seldom as possible.

31. Introduction of hepatotoxic substances/all medications into a patient's (with chronic Hep C) medical regimen when viable alternate medications can be used, is poor medical practice, bordering on malpractice and a violation of medical ethics, and can result in liver damage or even death.

32. It may not always be possible to avoid the introduction of an hepatotoxic medication into the medication regimen of a patient with chronic Hep C and whenever this is done one must give careful consideration to the risk-benefit aspect which consists of both objective and subjective criteria and for this reason must be discussed with the patient so that he can make an informed decision because an important aspect of the subjective criteria in particular are the patient's thoughts and feelings. Such patient involvement in his own

care is one of the most fundamental standards of practice and care in medicine and in this regard is identical for civilians and prisoners alike.

33. The level of caution is elevated even further for possible introduction of hepatotoxic medication into the medication regimen of a chronic Hep C patient the longer the elapsed time (in years) since contracting the disease especially when a liver biopsy evaluation (for staging liver damage) is not available to assess the patient's baseline liver damage for prognostic and treatment purposes. In such instances one errs on the side of caution and, to do so it standard medical practice.

34. Mr. Keith Niemic gave me a copy of part of his extensive medical records for my review at his request and my personal knowledge of his care and treatment is derived from those records as well as a self-report of his medical history where relevant and in lack of his earlier records.

35. Mr. Niemic was diagnosed with Hep C genotype 1 in 1997, the most virulent genotype.

36. He began pegylated interferon with ribavarin (combination therapy) antiviral treatment in January 2001.

37. The record reveals that he discontinued treatment after about 20 weeks (5 months) instead of the recommended 48 weeks due to "severe headaches" (HA).

38. Four years after treatment cessation the records indicate a decrease in the patient's viral load to the 30,000 IU/M (International Units/Milliliter) from a self-reported pre-antiviral treatment range of approximately 1,800,000 IU/ml. So although the patient's antiviral treatment ended prematurely, the viral load of the Hep C virus in his blood was dramatically reduced indicating a positive response to treatment. What's more that tab value is from approximately 4 years status-post his incomplete antiviral treatment which supports some degree of significant SR ("Sustained Response" to treatment) although not quite at the undetectable level desired.

39. The patient should probably have a liver biopsy to stage his liver damage (if any) as 10-25% of chronic Hep C patients develop cirrhosis within 10-15 years and many of them do not show signs or symptoms of that damage. Currently, the extent of damage to this patient's liver remains unknown.

40. The patient is going on his 10th year since diagnosis (and one must bear in mind that he may have been infected a considerable number of years prior to diagnosis), and is of genotype 1 and elevated liver enzymes all, which support a liver biopsy evaluation.

41. The patient's record indicates liver enzyme elevations in 3 separate tests spanning dates of, 27 October 2004 to 8 April 2005. The elevations of his AST & ALT are mild (compared to common elevations seen at 2-3x normal). However, any elevation at all is currently considered one of several criteria for anti-viral treatment when said elevations are persistent. The patient's liver enzymes have been persistently elevated.

42. The patient's record reveals multiple sick slips submitted and complaining of "severe HA" both during his antiviral treatment for Hep C in 2001 and right up to the present in 2005.

43. Between 2004-2005 the patient was twice sent to the Lemuel Shattuck Hospital (LSH) for the evaluation of his headaches by Doctor Kramer, a neurologist, in which he records Mr. Niemic's want for effective HA management to coincide with anticipated Hep C treatment.

44. Dr. Kramer, prescribed numerous medications trials, some of which were already on record as being tried and ineffective exHIBIT 3 wherein the medical records reveal that treatment with ultram during Mr. Niemic's Hep C treatment appeared to be most effective in treating HA, ex. 3, as this patients records do show that Dr. Kramer's prescription of fiorinal and imitrex may have also been effective had the patient been allowed to continue such prescribed treatment.

45. The record also reveals that during the period of 2004-2005 the patient was seen numerous times by D.O.C. nurse Practitioner (NP) Kathy Stout and Carl Singletary M.D., for complaints of "severeheadaches" in effective pain relief thereof and his desire to restart combination therapy for his Hep C as soon the HA treatment proved effective. Exhibit 1, as the antiviral treatment exacerbates his HA, ex. 4

46. The record reveals that the patient did not get pain relief from medication trials prescribed by NP Kathy Stout and Dr. C. Singletary. This is evidenced by his numerous sick slips submitted over an extended period with complaints about non-relief.

47. The record reveals an adversarial relationship, one that went from bad to worse, between the patient and NP K.Stout and Dr. C.Singletary, Exhibits 1, 2

48. The record reveals that around or about January, 2005 through April 2005, NP Stout and Dr. Singletary became suspicious of the patients requests for fiorinal for the relief of his HA as well as obvious doubt as to whether the patient was experiencing "severe" or "migraine" HA at all as evidenced by Dr. Singletary's repeated comments that the patient never presented with HA's on exam and that no other evidence such as reported behaviors of the patient in his cell block were found in support of his experiencing migraines. Exhibit 1.

49. The record reveals that Dr. Singletary discontinued the patient's fiorinal on January 13, 2005, due to his and NP K.Stouts references to the patient's drug seeking behaviors and past history of substance abuse. Exhibit 1.

50. The record does not reveal any detail whatsoever about precisely what those "drug seeking behaviors" consisted of. One can only assume that the patient's repeated requests for relief of HA pain and his insistence on fiorinal or ultram as the only medication that gave him relief were the basis for their concern and despite the patients compliance with numerous non narcotic trial medications that gave him no relief. See Exhibit 1.

51. The record reveals no evidence whatsoever of any current substance abuse. There are merely a few notations by NP K.Stout, that the patient "has a past history of substance abuse". Exhibits 2,1.

52. In lack of any evidence to the contrary it is impossible to derive from the record whether the patient's past history of substance abuse is current or assuming it is true, is nothing other then a problem in the patient's distant past (as measured in years.)

53. The record reveals neither the source to the assertion of the substance abuse contention, nor whether any evidence exists to support it other than the fact that a patient with an extensively documented history of HA/Migraines, who happens to be a convict is requesting relief with an effective medication.

54. The record reveals high doses of Motrin and Tylenol prescribed for the patient by any number of D.O.C. physicians, Exhibit 1,3. This was offered to him contrary to his whishes concerning both the lack of pain relief and potential damage of said medications can cause his liver. Both the prescription and the patient's wishes to this effect are documented at length, Exhibit 1, 3, 4. Further, it was offered for an extensive period of time spanning many months, ex. 1, 3.

55. It is a fact that medications such as Motrin and Tylenol (and others) are not recommended for patients with liver disease, specifically in this instance, Hep C chronic infection of at least 9 years duration and no liver biopsy to indicate staging of liver damage.

56. It is a fact that Motrin and Tylenol (and others) carry warnings on their labels cautioning their use for patients with hepatic diseases such as hepatitis and that their use if at all be done with caution, only for relatively short durations, and infrequency, Ex. 4.

57. It is a fact and a matter of standard guidelines of patient care and treatment to inform the patient of the potential risks/hazards and benefits of treatment.

58. The record does not reveal any discussion with the patient pertaining to the risks or benefits of high dose, long-term treatment of his HA's with Motrin and/or Tylenol.

59. It is my best judgment based upon my medical training that this patient is an appropriate candidate for liver biopsy based upon his meeting many of the recommended guidelines and criteria. This would greatly help with both prognosis and treatment considerations.

60. It is my best judgment based upon my medical training, the current medical literature, the patients record of virulent Hep C genotype (1a), the almost 10 years since diagnosis, his age, his persistent liver function test (LFT) elevation and his positive response to past partial treatment (as measured by his viral load 4 years after discontinuing treatment) with antiviral, that he would benefit from restarting and completing his treatment (48 weeks).

61. It is a fact that, barring any current substance abuse, this patient's disease has a natural history of progression that only gets worse, never gets better and there is no positive medical gain from putting off his treatment any longer.

62. It is a fact that combined pegylated interferon and ribavarin antiviral therapy for Hep C has numerous possible side effects (SE) including headaches. EX 4.

63. It is revealed in the record that Mr. Niemic has a history of migraines going back to childhood, (ex. 1, 3) and had to stop his Hep C antiviral treatment in 2001, 5 months into his 10 month treatment due to "severe" HA's and ineffective HA relief from medications offered to him. ex. 3.

64. It appears to me that the record far from supports a conclusion that the patient is "drug seeking" or has any current substance abuse whatsoever and, even were it true it does not

mean that he does not truly suffer from said HA's, nor does it mean that he cannot nor should not be given pain relief he claims works for him just because it's a claimed narcotic.

65. Mr. Niemic's medical history of HA's and multiple evaluations by a neurologist who prescribed low dose fiorinal to begin with, all support his medical claim.

66. Further, and even more compelling I have rarely, if ever, seen a young relatively healthy patient who would forego or terminate a potentially life-saving, life-prolonging treatment for a deadly disease just to get a low dose of non-narcotic for a medical complaint of pain they don't really have. Such a patient would have to be either insane, grossly disturbed or an active addict/substance abuser to do this. The medical record does not support any of these conclusions. And, to the contrary, strongly supports the conclusion that the patient's claim may be genuine.

67. It is my best judgment based upon my medical training, the medical literature and the patient's records that given the patient's medical history he may indeed be suffering so badly from his headaches, that he can only tolerate 48 weeks of very unpleasant, but much needed antiviral therapy if he gets HA relief during that period, and the use of even a low dose narcotic during that period with careful monitoring for actual evidence of substance abuse would be appropriate. See exhibit 4.

68. The gravity of the potential deleterious consequences of indirectly preventing Hep C antiviral treatment for this patient with a known deadly disease, is far outweighed by the treatment benefits to him even if one factors in the possibility that he may be "malingering" and "drug-seeking" (which the record hardly supports) and may have possibly "manipulated" the system into prescribing a low (essentially harmless) dose of a given non-narcotic, especially when there is no evidence in the record of a current drug habit.

69. From a clinical perspective low dose Ultram or Fiorinal for his HA over the period of his antiviral treatment would be harmless to the patient and potentially very helpful if in fact he experiences the kind of HA relief that would allow him to tolerate a long and very uncomfortably, but potentially life-saving treatment. So the question now becomes an ethical one in which the proven life-saving potential of treatment must be weighed against the harm of prescribing the low dose of medication this patient requests. From a medical ethics perspective the answer is obvious. Treat the patient along with giving him a harmless dose of pain relief medication at least for the duration of his life-saving treatment.

70. From my experience in medicine, working with all manner of patients with all manner of disorders and diseases, as well as from the medical literature, pain is a subjective thing, can be very difficult to assess and more often than not, goes untreated. Treatment is so often further confounded by other subjective factors such as the "likeability" of a patient or doctor that can sour and distort the doctor-patient relationship and lead to adversarial interactions caused by one or both parties. This must not interfere with a physician's medically sound and ethical judgment and from my review of the record it appears that this may well be just such an instance.

71. There is a wide array of cautionary options left to a physician who suspects that a patient is abusing substances malingering and for Somatizing including all the following which are relatively simple, noontime-consuming steps:
    1. Agree with patient upon random urine testing for substance abuse and as a condition for medication.
    2. Prescribe any narcotic at the minimally effective dose, and as a PRN thus setting a limit.
    3. Prescribe the medication only with a frequency reflective of the number of HA attacks experienced by the patient per week (or month) as supported by his past medical history in the record.
    4. Monitor the frequency with which he then takes that PRN medication with special attention toward whether its taken like clockwork and always exhausts the weekly/monthly limits, as HA do not occur on a rigidly set schedule with rigidly frequency set meaning if a patient has HA that are arranged out for their frequency and duration, he may still go days, weeks or months without an attack and a need for the PRN.
    5. Monitor the patient with attention to requests for even higher and even more frequent doses of medication.
    6. Ask for any reports from staff of evidence of substance abuse (the only way to establish a record).
    7. Warn the patient that any current substance abuse or manipulation (i.e. hiding or storing his medication) will lead to the immediate cessation of the medications of concern for a set duration only after which he can be re-evaluated again.

All the above are easy and common steps and in accordance with sound medical judgment. If and when the physician suspect's substance abuse which, incidentally is far more easily and effectively monitored in the highly controlled prison environment then in civilian life.

SIGNED UNDER THE PENALITIES OF PERJURY: ______________________

Daniel Mason W-70314

This 26th day of November 2005.

# COMMONWEALTH OF MASSACHUSETTS

## DEPARTMENT OF CORRECTION

## INMATE GRIEVANCE APPEAL FORM

## FORWARD TO SUPERINTENDENT

**Name** NIEMIC KEITH **Institution** MCI NORFOLK

**Number** W61426 **Housing** SMU1 **Appeal Date** 30-OCT-2005 **Date Of Grievance** 23-AUG-2005

**Appeal Received Date** 18-NOV-2005

**Appeal** Grievance #12780 - I did previously submit a legal meterial request and enclosed my original medical records seeking xerox copies, sending them to Law Libraian, Mary Morrison at SBCC on 10/10/05. On 10/20/05 after waiting 10 days for the Law Librarian to send me my medical records and legal requested material for which she is responsible due to my transfer to Norfolk on 10/11/05. I did send Mary Morrison a written request to send my documents to me on this date 10/20/05 via first class mail. As of the present date I have not once been notified by her, nor given any of my legal request of medical records. The gross negligence of which she did previously file false statement GLC 26836A slander/libel against me as retaliation for filing complaints.

**Remedy Requested** I respectfully request a timely return of all my submitted legal material requests and the return of my medical records.

**Staff Recipient** McDermott Barbara J CO II

**Signature**

## DECISION BY SUPERINTENDENT

**Appeal Received Date** 18-NOV-2005 **Decision Date** 28-DEC-2005 **Decision** DENIED

**Decision By** Russo Lois A SUPERINTENDENT

**Reasons** Grievance appeal has nothing to do with original grievance filed; grievance process is not the appropriate method of challenging a disciplinary report; You appealed the disciplinary finding on D report 59625 and a decision was rendered on 8/29/05; as such, this matter is closed.

**Signature** **Date**

## INMATE RECEIPT

**Inmate's Name** NIEMIC KEITH **Institution** MCI NORFOLK

**Number** W61426 **Appeal Received Date** 18-NOV-2005

**Staff Recipient** McDermott Barbara J CO II

**Superintendent's Signature**



4

UMass Correctional Health

Signed UMCH med Recs RECEIPT FORM AND WAS GIVEN THIS FORM ONLY 1-10-06

**TO:**

**FROM:** Renate M. White, Administrative Coordinator

**THROUGH:** Donna L. Jurdak, RN, CCHP, Health Services Administrator

**DATE:**

**SUBJECT:** Request for Medical Record Copies

Please be advised in accordance with HIPPA regulations as well as UMCHP Policy (62.01) the medical records department can only copy those items in your medical record which were produced at MCI-Norfolk. All requests must explain exactly what you would like copies of.

Any reports, labs, consultations, etc from any outside hospital including Lemuel Shattuck must be requested through that hospital. We can not by law and policy copy and distribute this information.

If you have an you have any questions or concerns, please see me at Access Hour or by written communication.

4

12 /19/2005

MR. NIEMIC

YOU NEED TO WRITE AND SEND YOUR OWN MEDICAL REQUEST TO THE OUTSIDE HOSPITAL, THEY WILL SEND YOU THEIR OWN REQUST FORM FOR YOU TO SUBMIT.

THANK YOU
MEDICAL RECORDS DEPT.

4

# COMMONWEALTH OF MASSACHUSETTS

## DEPARTMENT OF CORRECTION

### INMATE GRIEVANCE FORM

### FORWARD TO INSTITUTIONAL GRIEVANCE COORDINATOR (IGC)

**Name** NIEMIC KEITH **Grievance#** 15115 **Institution** MCI NORFOLK

**Commit No.** W61426 **Housing** SMU1 **Date Of Incident** 20051112 **Date Of Grievance** 20051214

**Complaint** NOT considered an emergency- MCI CJ: On 11/17/05 walpole property did randomly send to me only 10 out of the 15 of my personal books witholding 5 of which are very expensive medical books that are critical importance and clearly marked evidence in current court matters. I have subsequently been sent two property disposal notices in which I have less than 30 days to dispose of these 5 books and I was never given the opportunity to pick and choose what books I wanted and those I didn't, in violation of both my statutoryand constitutional rights. I am serving a life sentence and am indigent with no close family and was previously given access to long term storage by Supt. Allen of my personal property. As its obvious retaliation for filing complaints the denial of such property in legal matters now in court is a criminal offense.

**Remedy Requested** To kindly be given immediate access to the 5 books in bin 4C at walpole sending them to Norfolk in exchange to the 5 books now in my possession that I'll donate to the library.

**Staff Recipient** Kenney Kimberly A CO II

**Staff Involved**

**Signature**

### RECEIPT BY INSTITUTIONAL GRIEVANCE COORDINATOR

**Date Received** 20051216 **Decision Date** 20051229

**Signature** Kenney Kimberly A CO II

**Final Decision** PARTIAL APPROVAL

**Decision** According to you, on this decision date, this matter has been resolved. These books, that were previously deemed as excess property, were sent to you and are presently in your possession.

**Signature** K. Kenney **Date** 12/29/05

**Denied grievances may be appealed to the Superintendent within 10 working days of Institution Grievance Coordinator's decision.**

### INMATE RECEIPT

**Name** NIEMIC KEITH **Institution** MCI NORFOLK

**Commit No.** W61426 **Grievance#** 15115 **Date Received** 20051216

**Signature.** Kenney Kimberly A CO II

EX-4

# COMMONWEALTH OF MASSACHUSETTS

## DEPARTMENT OF CORRECTION

### DISCIPLINARY REPORT

**Inmate** NIEMIC, KEITH **Commit No** W61426 **Housing Unit** SMU1

**Date** 20060201 **D- Report No.** 69413 **Institution** MCI NORFOLK

| Category | Offense(s) |
|---|---|
| 3 | 04-Threatening another with bodily harm or with any offense against another person, property or family |
| 3 | 05-Refusing a direct order by any staff member |
| 3 | 26-Use of obscene, abusive or insolent language or gesture |
| 3 | 29-Attempting to commit any of the above offenses, making plans to commit any of the above offenses or aiding another person to commit any of the above offenses shall be considered the same as the commission of the offense itself |
| 4 | 11-Violating any departmental rule or regulation, or any other rule, regulation, or condition of an institution or community based program |

**Description of Offense(s)**

On February 1st, 2006, Inmate Niemic, Kieth was up for a shower on the first floor. With recreation and other issues on the floor I, Sergeant Joseph Tammaro accidently skipped over Inmate Niemic. I told Inmate Niemic that I would place h in the shower next. Inmate Niemic became verbally abusive stating " GO FUCK YOURSELF , YOU PIECE OF SHIT!" "FUCK OFF!" " YOU TELL ME YOUR GONNA DO SOMETHING AND YOU CHANGE UP!' I apologized for the mix u but told Inmate Niemic his comments were unnecessary. He continued to swear at this Officer. I left the vicinity of his c When the showers were back open, I approached Inmate Niemic and asked if he wanted his shower. He stated that he would take it later. Inmate Niemic was informed that if he did not take his shower now he would be listed as a refusal. H again stated that he would take it later. I told Inmate Niemic he would be listed as a refusal. Lieutenant L. Kelley and Sergeant J. Houle were notified.

**Disciplinary Report Type:** Formal

**Has Inmate been placed on Awaiting Action Status** Yes [X] No [ ]

**Referred to DA** [ ] Yes [X] No **Referred to DDU** [ ] Yes [X] No

**Reporting Staff** Joseph D Tammaro **Date** 20060201 **Time** 11:28

**Days off** Thu Fri

**Shift** 7x3

**Supervisor** Ronald R Bissonnette **Date** 20060203 **Time** 12:20

**Shift Commander** James A Emerson **Date** 20060203 **Time** 12:21

**Disciplinary Officer** Hector L Chavez **Date** 20060203 **Time** 12:13

**Results**

| Offenses | Sanctions | Start Date | Unit | #of Units | Credits | End Date | Amount |
|---|---|---|---|---|---|---|---|

**Reviewing Authority** ______ **Date** ______ **Time** ______

EX-4

UMASS CORRECTIONAL HEALTH
A Commonwealth Medicine Program

# Inmate Grievance and Appeal Form

Facility: MCI-NORFOLK  Grievance ☑  Date: 2-6-06

Inmate First Name: KEITH  ID#: W61426  Appeal ☐  Date:

(PSYCHIATRIST) DR FELDER DID ARBITRARILY AND RETALIATE AGAINST THE PLAINTIFF FOR FILING COMPLAINTS. WHEREUPON DR. FELDER DID OPENLY DISCLOSE MY PSYCHIATRIC TREATMENT TO INMATES ON THE TIER WITHOUT MY CONSENT IN VIOLATION OF MGL C 214 § 1B and C. 233 § 20B; LACK of INFORMED CONSENT, AND WHO ABRUPTLY DISCONTINUED MY DAILY MEDICATION of ADDERAL FOR WHICH HAS BEEN EFFECTIVELY HELPING ME FOR SEVERAL YEARS AND WHO STOPPED WHILE AT 40 MGS a day with NO TAPER, THE MALEVOLENCE of WHICH WAS MEANT TO CAUSE HARM BECAUSE I AM SUPPOSED TO START THE TOXIC PEGELATE LIVER TREATMENT SOON, AND DONT KNOW IF I'LL BE ABLE TO BECAUSE I'M SUFFERING WITHDRAWAL, DEPRESSION, ANXIETY AND CHEST PAINS, LOSS of APETITE, SLEEP, AND CANT READ OR DO LEGAL WORK IN VIOLATION of THE ADA of 1990 USCA CONST AMENDS 4, 5, 8 and 14 (and Art. 114 Mass Const)

THAT DR. FELDER BE GIVEN REPRIMAND AND TO IMMEDIATELY BEGIN TITRATION of ADDERAL TO BE PROPERLY TAPERED OFF, OR TO BE GIVEN AN IMMEDIATE ALTERNATIVE TREATMENT TO ADDRESS PLAINTIFFS CURRENT ANXIETY/DEPRESSION, LOSS of SLEEP, etc. OTHERWISE YOUR FAILURE TO IMMEDIATELY ADDRESS THE SERIOUSNESS of THIS MATTER WILL RESULT IN YOUR INCLUSION IN A CIVIL RIGHTS COMPLAINT THAT WILL BE FILED ON DR. FELDER

Keith [signature]  2-6-06

| Date Received: | | Staff Recipient: | | Routed To: | |
|---|---|---|---|---|---|

copy: file
DOC Health Services Division
U.S. Dist Court

4

FORM "A"

**COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF CORRECTION**
**INMATE GRIEVANCE FORM**

| INMATE'S NAME: | INMATE'S #: | DATE: |
|---|---|---|
| KEITH NIEMIC | W61426 | 2-1-06 |

| INSTITUTION: | DATE OF INCIDENT: |
|---|---|
| MCI-NORFOLK | 2-1-06 |

**INSTRUCTIONS:**

1. Refer to 103 CMR 491, Inmate Grievance Policy.
2. In **Block B**, give a brief and understandable summary of your complaint/issue.
3. List any actions you may have taken to resolve this matter in **Block C**. Be sure to include the identity of staff members you have contacted.
4. Provide a Requested Remedy in **Block D**.

**A. When filing an Emergency Grievance check Emergency.**

______**EMERGENCY**

**B. Give a brief and understandable summary of your complaint/issue. Additional paper may be used, if necessary.**

ON THIS DAY UPON RECIEPT OF "LEGAL MAIL" THIS MORNING Sgt. Tamarra and C/o Levesque did both make HARRASSING COMMENTS TO ME DURING BREAKFAST AND SHORTLY THERE AFTER, ABOUT MY LAWSUIT "NEITHER OF WHOM ARE DEFENDANTS IN ANY CIVIL ACTION OF MINE.

THEN C/O LEVESQUE WHO ESCORTED ME TO THE SHOWER DID STATE THAT "I'M GONNA REGRET IT" WITHOUT ELABORATING, THEN UPON RETURNING TO MY CELL FROM THE SHOWER ALL OF MY LAW AND MEDICAL BOOKS WERE THROWN ALL OVER THE FLOOR WITH ALL MY LEGAL WORK AND I AM MISSING MY WATCH AND GOLD CHAIN WITH RELIGIOUS MEDAL THAT Sgt Tamarra & C/o Levesque TOOK & WON'T RETURN (see attached affidavit)

**C. List any action taken to address/resolve this matter. Include the identity of staff members you have contacted.**

NOTE: I HAVE A WITNESSES AFFIDAVITS IN SUPPORT THAT DOES CORROBORATE THE ABOVE FACTS. PLEASE INVESTIGATE BY PERSONALLY SEEING ME PURSUANT TO 103 CMR 491.10(1)(c).

*NOTE* (DID SEEK ASSISTANCE OF Lt. KELLY TO NO AVAIL)

**D. Provide your Requested Remedy.** I WANT THE RETURN OF MY OMEGA WATCH AND MY 18" HERRINGBONE AND RELIGIOUS CROSS IMMEDIATELY, AS I ALSO SEEK REPRIMAND OF THESE TWO OFFICERS, AND TO NOT EVER AGAIN BE HARRASSED OR INTIMIDATED BECAUSE OF MY EXERCISE OF MY 1ST AMENDMENT RIGHTS THAT DO NOT THREATEN SECURITY

**Inmate's Signature** Keith Niemic **Date:** 2-1-06

**Staff Recipient**______________________ **Date:**__________

****DENIED GRIEVANCES MAY BE APPEALED TO THE REVIEWING AUTHORITY WITHIN 10 BUSINESS DAYS.**
**(Inmate receipts/responses will be generated via the Inmate Management System.)**

copy: file

4

# Inmate Grievance and Appeal Form

Facility: MCI-Norfolk  Grievance ☑  Date: 1-27-06

Inmate First Name: KEITH  ID#: W61426  Appeal ☐  Date:

Inmate Last Name: [illegible]  Date of Birth: [illegible]  Housing Unit: [illegible]

**Summary of Grievance or Reason for Appeal (Attach Additional Sheets As Necessary):**

On this day approx. 1:00 pm psychiatrist Dr. Felder did approach my cell and did abruptly state and disclose my private mental Health Diagnosis and treatment on the tier, loudly for all inmates to hear without my consent.

Dr. Felder also arbitrarily stated that because I refused to see her, she is now discontinuing my Adderal medication, of which I've been on for years. Not to mention that it is dangerous to abruptly discontinue such meds without a taper.

**Remedy Requested (Attach Additional Sheets As Necessary):**

I want my Adderal medication to remain as it has been successfully helping me for years and to have Dr. Felder Reprimanded and taught the proper Ethical and professional norms of mental health care

| Inmate Signature: | Date: |
|---|---|
| [signature] | 1-27-06 |

- Completed forms may be filed with the HSA/DON/MHD or placing the form in the Sick Call Box. For [illegible]
- [illegible]
- An appeal [illegible] within ten (10) working days from the receipt of [illegible] the HSA.
- Appeals should be filed with the HSA. For inmates [illegible] may be handed to rounding HSU staff.
- An inmate may file the appeal directly with the UMCH Medical Director, by sending it to:
  Medical Director
  UMass Correctional Health
  One Research Drive – Suite 120C
  Westborough, MA 01581

**Health Services Unit Use ONLY:**

| Date Received: | | Staff Recipient: | | Routed To: | |
|---|---|---|---|---|---|

copy file

9

August 24, 2005

Secretary Edward Flynn
Executive Office of Public Safety
One Ashburton Place, Room 2133
Boston, MA 02108

Dear Mr. Flynn:

I represent Keith Niemic, W-61426, who is currently confined in the special management unit (SMU) at Souza Baranowski Correctional Center. He has a serious medical condition that is not being properly treated by DOC or U-Mass medical staff. I have addressed this problem with all appropriate personnel but have received no improvements in the health care provided, leaving me to seek help from your office.

In summary, on approximately June 13, 2005 at MCI Cedar Junction, my client was the victim of an assault in which he was stabbed, resulting in several lacerations and a herniated disc. While Mr. Niemic was receiving emergency medical treatment, Sergeant Patrick Mulvey of the IPS confiscated Mr. Niemic's address book containing attorney and family addresses and telephone numbers with twenty one postage stamps, and later placed him in 10 block segregation in his bare feet. While in 10 block, my client's radio, walkman, two headphones and three legal books were seized and confiscated and ordered to be disposed by property officer Gillette, in contravention of M.G.L. c. 127, sec. 3. Mr. Niemic was then shipped to SBCC on July 26, 2005, where he has been denied a medical examination in contravention of 105 CMR 205:100-200. He has experienced abnormal muscle contractions causing a fall on July 27, 2005 which exacerbated his herniated disc, and he has been denied any examination or testing to determine if there has been further injury to his spine.

Mr. Niemic has filed multiple sick slips, complaining of severe pain and was seen by a nurse practitioner on August 4, 2005 and Medical Director Dr. Tavares at SBCC on August 10, 2005. Both refused to provide an examination, or x-rays, back support, cane, crutches, wheelchair or effective pain management medication. As a result, he has been unable to properly eat, sleep, exercise, or take

4

showers. Additionally, his confinement in a segregation cell while deprived of his address book and stamps, denying him access to his family, and his legal materials, denying him effect access to his ongoing legal matters, constitutes excessive punishment.

I would appreciate any action your office could take to remedy this situation and insure the proper medical treatment and the return of property to my client. Thank you for your assistance.

Sincerely,

Deirdre Thurber

cc: Keith Niemic

4

July 29, 2005

Kathleen Dennehy, Commissioner
Department of Corrections
50 Maple Street
Milford, MA  01757-3698

Re:  Keith Niemic W-61426 J-3 #8
     SBCC

Dear Ms. Dennehy:

        I am writing to you on the bequest of Keith Niemic whom
I represent through CPCS on post-conviction matters.

        He recently informed me of a situation where he was
removed from Cedar Junction and moved to SBCC.  During the
move, his personal and legal property was either destroyed
or misplaced.  He was also been deprived of medications and
medical treatment, even though he was removed from his cell
by DOC personnel and taken to the nurses' station where he
received no treatment but for the taking of his vital signs.
He was returned to his cell without an examination,
treatment, or the re-institution of his medications.  At the
time he contacted me, he still had not received his
medications or treatment for his injuries.

        Please be advised that Mr. Niemic intends to avail
himself of all his legal remedies if this situation is not
addressed and rectified immediately.

                              Sincerely,




                              Deirdre Thurber


cc:  Keith Niemic

August 12, 2005

David Nolan, Superintendent
MCI Cedar Junction
P.O. Box 100
South Walpole, MA  02071

Re:  Inmate Keith Niemic

Dear Mr. Nolan:

As was suggested to me in a telephone conversation of
August 11, 2005 with your office, I am writing to you
concerning property belonging to Mr. Keith Niemic who, until
his recent transfer to SBCC, was housed at Cedar Junction.

Prior to his transfer, CO Patrick Mulvey removed Mr.
Niemic's address book and twenty one [postage stamps.
Walpole Grievance Officer Ann Marie Aucoin approved Mr.
Niemic's grievance on June 28, but, to date, this property
has not been returned. This should be rectified immediately.

Additionally, three Massachusetts Practice law books
(vols. 14A, 14B and 19), two Sony headphones, one Sentry
table top radio, one Aiwa walkman and one American Curves
magazine were confiscated without just cause by CO Gillette.
Please take whatever steps necessary to have this property
transferred to Mr. Niemic at SBCC SMU J-3 as soon as
possible.

Please advise me as to the actions taken by your office
to address these concerns.

Sincerely,

Deirdre Thurber

cc:  Keith Niemic

EX-4

# COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF CORRECTION
### INMATE GRIEVANCE FORM
### FORWARD TO INSTITUTIONAL GRIEVANCE COORDINATOR (IGC)

**Name** NIEMIC KEITH **Grievance#** 16034 **Institution** MCI NORFOLK

**Commit No.** W61426 **Housing** SMU1 **Date Of Incident** 20060201 **Date Of Grievance** 20060201

**Complaint** On this day upon receipt of my legal mail this morning, Sgt Tammaro and CO levesque did both make harassing comments to me during breakfast and shortly thereafter about my lawsuit neither of whom are defendants in any civil action of mine. Then CO Levesque who escorted me to the shower did state that I'm gonna regret it without elaborating then upon returning to my cell from the shower all of my law/ medical books were thrown all over the floor with all my legal work and I am missing my watch and gold chain with religious medal that Sgt. Tamarro and CO Levesque took and won't return.

**Remedy Requested** I want the return of my omega watch and my 18 inch herringbone and religious cross immediately. as I also seek reprimand of these two officers and to not ever again be harassed or intimidated because of my exercise of 1st ammendment rights that do not threaten security

**Staff Recipient** Kenney Kimberly A CO II

**Staff Involved** Levesque Gary P CO I
Tammaro Joseph D CO II

**Signature**

### RECEIPT BY INSTITUTIONAL GRIEVANCE COORDINATOR

**Date Received** 20060203 **Decision Date** 20060203

**Signature** Kenney Kimberly A CO II

**Final Decision** Referred to Internal Affairs

**Decision** Due to the nature of your allegations, this grievance has been referred to the Internal Affairs Unit through the Superintendent's Office.

**Signature** K. Keane **Date** 2/3/06

**Denied grievances may be appealed to the Superintendent within 10 working days of Institution Grievance Coordinator's decision.**

### INMATE RECEIPT

**Name** NIEMIC KEITH **Institution** MCI NORFOLK

**Commit No.** W61426 **Grievance#** 16034 **Date Received** 20060203

**Signature.** Kenney Kimberly A CO II

EX-4

FORM "B"

**COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF CORRECTION**
**INMATE GRIEVANCE APPEAL FORM**

| INMATE'S NAME: | INMATE'S #: | DATE: |
|---|---|---|
| Keith Niemic | W61426 | 9-6-05 |
| **INSTITUTION:** | **ASSIGNED GRIEVANCE #:** | |
| SBCC | 12569 | |

**INSTRUCTIONS:**
1. Refer to 103 CMR 491, Inmate Grievance Policy.
2. Provide your appeal argument in **Block A**, in a brief and understandable manner.
3. Provide your requested remedy in **Block B.**

**A. Provide your appeal argument in a brief and understandable manner.**

I have herniated disk w/ sciatica, and upon arrival to SBCC on 7-26-05 I have not been given a physical examination pursuant to MGL c. 127 §§16-18, or 105 CMR 205:100-200 (Pub. Health Min standards...)
THE DENIAL of WHICH RESULTED IN A FALL WHICH EXASPERATED my HERNIATED DISK WITH SCIATICA ON 7-27-05,.
I HAVE FILED MULTIPLE GRIEVANCES (MEDICAL) AND DID EXPLICITLY NOTIFY YOUR office (Superintendent) SEVERAL TIMES THAT "I AM GOING TO LOSE MY MIND...", UNLESS I RECIEVE PROPER AND IMMEDIATE MEDICAL CARE, DUE TO EXCRUCIATING UNENDING PAIN.
I HAVE BEEN SEEN ONCE BY AN N.P. and ONCE BY MEDICAL DIRECTOR, DR. TAVARES, BOTH of WHOM REFUSED TO PROVIDE ME WITH MORE EFFECTIVE PAIN MANAGEMENT, OR ANY MEDICAL DEVICES NECESSARY FOR MOBILITY AND SUPPORT.
THE CONTINUED DELIBERATE INDIFFERENCE TO MY SERIOUS MEDICAL NEEDS, RESULTED IN ME SWALLOWING A RAZOR IN THE HOPE of ACQUIRING EMERGENCY (PROPER) MEDICAL CARE) on 8-24-05, THAT of WHICH RESULTED IN FORCED ISOLATION, WITH NOT EVEN A SCINTILLA of MEDICAL TREATMENT IN ANY WAY, SHAPE, OR FORM.

**B. Provide your requested remedy**

TO BE GIVEN, THE EFFECTIVE, AND ADEQUATE, IMMEDIATE MEDICAL CARE NECESSARY FOR MY SERIOUS MEDICAL NEEDS, THAT ARE ALSO REFLECTED BY THE EVOLVING STANDARDS of DECENCY WITHIN THE COMMUNITY, AND SET FORTH IN THE STATUTES, AND REGULATIONS

**Inmate's Signature** [signature] **Date:** 9-6-05

**Staff Recipient**__________ **Date:**__________

**(Inmate receipts/responses will be generated via the Inmate Management System.)**

copy: file

EX-4

UMASS MEDICAL SCHOOL UMASS CORRECTIONAL HEALTH © A Commonwealth Medicine Program

# Inmate Grievance and Appeal Form

Facility: SBCC

Grievance ☑ Date: 8-23-05

Inmate First Name: KEITH ID#: W61426 Appeal ☐ Date:

Inmate Last Name: NIEMIC Date of Birth: 6-19-68 Housing Unit: SMU J-3

**Summary of Grievance or Reason for Appeal (Attach Additional Sheets As Necessary):**

Ive submitted multiple sick call request slips, regarding extreme lower back pain with sciatica, which grossly restricts my mobility causing Extreme Duress by depriving me the use of my legs, and restricting me to have to remain in my cell 24 hours a day 7 days a week, the extreme pain of which has further caused the inability to eat, sleep, or get fresh air, or showers. The repeated neglect of which is in violation of 103 DOC 630.10(4) which mandates that an inmate is to be seen by an RN or MD within 24 hrs. of submitting a sick slip.

- I feel as though I am literally being tortured, as I was further deprived an intake examination compliant with 103 DOC 630.09, 06, 15, 16, and denied my right to health care pursuant to segregation policy 103 DOC 630.17.

**Remedy Requested (Attach Additional Sheets As Necessary):**

I respectfully request immediate diagnosis and treatment by an MD, for which Ive been waiting for proper medical care of an unbias nature, so that I can begin to enjoy fresh air, mobility, and activities that all other inmates get to participate in.

| Inmate Signature: | Date: |
|---|---|
| [signature] | 8-23-05 |

- Completed forms may be filed with the HSA/DON/MHD or placing the form in the Sick Call Box. For inmates in special management units, forms may be handed to rounding HSU staff.
- An inmate may appeal the decision of the HSA/DON/MHD to the UMCH Medical Director.
- An appeal must be filed within ten (10) [illegible] days [illegible] of the decision by the HSA.
- Appeals should be filed with the HSA. [illegible] forms may be handed to rounding HSU staff.
- An inmate may file the appeal directly with the UMCH Medical Director by sending it to:
  Medical Director
  UMass Correctional Health
  One Research Drive, Suite 120C
  [illegible], MA 01581

RECEIVED

Health Services Unit Use Only

| Date Received: | AUG 25 2005 | Staff Recipient: | | Routed To: | |
|---|---|---|---|---|---|

copy: file 05-318



4

*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*

*Department of Correction*
*Souza-Baranowski Correctional Center*

**Mitt Romney**
*Governor*
**Kerry Healey**
Lieutenant Governor
**Edward A. Flynn**
*Secretary*

*P. O. Box 8000*
*Shirley, MA 01464*

**Kathleen M. Dennehy**
*Commissioner*
**James R. Bender**
*Deputy Commissioner*
**Lois Russo**
*Superintendent*

August 16, 2005

Deirdre Thurber, Attorney
19 Bloody Pond Road
Plymouth, MA 02360

Dear Attorney Thurber :

Your letter of July 29, 2005 to Commissioner Kathleen Dennehy and Assistant Deputy Commissioner John Marshall concerning Keith Niemic, W61426 has been referred to my office for response.

Mr. Niemic was transferred to Souza Baranowski Correctional Center from MCI-Cedar Junction on July 25, 2005. Mr. Niemic was medically screened upon arrival and no "injuries" or medical issues were noted as a result of the transfer. Mr. Niemic has medical issues that are being resolved via a neurosurgical consult, which was initiated while he was at Cedar Junction. He has been receiving medication for pain associated with this condition.

He has received the property sent by Cedar Junction, with the exception of one cubic foot of legal material, which is in storage.

It is within Mr. Niemic's rights to "avail himself of all his legal remedies." However, staff at SBCC consider his medical and property issues to be appropriately addressed. Utilizing threatening and/or intimidating language in correspondence is unprofessional and unproductive in resolving matters related to your client.

Please do not hesitate to contact my office if you have additional concerns.

Sincerely,

Lois Russo
Superintendent

KD/LR/lm

cc: Kathleen M. Dennehy, Commissioner
Inmate File
File

EXHIBIT #H6

# COMMONWEALTH OF MASSACHUSETTS

## DEPARTMENT OF CORRECTION

## INMATE GRIEVANCE APPEAL FORM

## FORWARD TO SUPERINTENDENT

**Name** NIEMIC KEITH **Institution** SOUZA-BARANOWSKI CORRECTIONAL

**Number** W61426 **Housing** J3 **Appeal Date** 21-JUL-2005 **Date Of Grievance** 05-JUL-2005

**Appeal Received Date** 26-JUL-2005

**Appeal**

Attached herein, made a part of the record are the IGC response, and property contraband green form that I request copies of, and/or the original returned.
Unfortunately grievance coordinator Aucoin's rhetorical semantics, and failure to interview me personally pursuant to 103cmr491.10(1) (c); sadly reflects the gross negligence at Walpole. the general conditions of which were criticized in the Harshbarger report of June 2004.
For purposes of disillusionment only: Mass Statute: c.127?3, does explicity state : "they shall keep a record of all money or other property found in possession of prisoners committed to such institutions, and shall be responsible to the commonwealth for the safekeeping and delivery of said property to said prisoners or their order on their discharge, or at any time before."
Thus, Mrs. Aucoin's arbitrary denial borders on criminal larceny and conspiracy.

**Remedy Requested**

I respectfully request my: 2 Sony headphones
1-Sentry table top
1-Alwa walkman,
and my
3-Mass practice books; all of which contains my name pursuant to GLC. 125 ?12, and the safekeeping of my property.

**Staff Recipient** Aucoin Ann Marie CO I

**Signature**

## DECISION BY SUPERINTENDENT

**Appeal Received Date** 26-JUL-2005 **Decision Date** 30-AUG-2005 **Decision** DENIED

**Decision By** Marshall John ADC

**Reasons** I concur with the IGC.

**Signature** [signature] **Date** 8/30/05

## INMATE RECEIPT

**Inmate's Name** NIEMIC KEITH **Institution** SOUZA-BARANOWSKI CORRECTIONAL

**Number** W61426 **Appeal Received Date** 26-JUL-2005

**Staff Recipient** Aucoin Ann Marie CO I

**Superintendent's Signature**

# COMMONWEALTH OF MASSACHUSETTS

## DEPARTMENT OF CORRECTION

### INMATE GRIEVANCE FORM

### FORWARD TO INSTITUTIONAL GRIEVANCE COORDINATOR (IGC)

**Name** NIEMIC KEITH **Grievance#** 11699 **Institution** MCI CEDAR JUNCTION

**Commit No.** W61426 **Housing** TEN BLOCK **Date Of Incident** 20050705 **Date Of Grievance** 20050705

**Complaint** After getting lugged approximately on 6/13/05 from 7 block and upon receipt of my property approximately one week there after (7) books were listed on my property iventory sheet, however, I did not receive (6) of my MASS practice law books, but was given all six pocket parts that belonged to these books. Also my color TV was omitted from the inventory sheet as proeprty CO Gillette furhter wrote that 2 of my Sony headphones, and table top radio and walkman are not mine, without given me due process where my name is on all these items-my property. It should be noted that both of my headphones and radios were in my homeboys possession, when I got lugged to 10 Block the last time, which of course wasn't marked on the property inventory sheet, where upon personally made inquiries with property CO Gillette about my missing headphones and radios upon my release form Ten Block. I was moved to 7 block form 10 after being lugged form 3 block and subsequently received my headphones and radios from my homeboy. IPS Cutting may be able to help verify my previous property situation. As my name is listed on all such property in which Sgt. McGreevy from Property did personally inventory all of my stuff and I have record of ownership.

**Remedy Requested** I would like to have my 6 Mass practice books given to me and my two Sony headphones and tabletop and walkman given to me as well. As I would like to have my TV located and marked on my property inventory. Thank you.

**Staff Recipient** Aucoin Ann Marie CO I

**Staff Involved**

**Signature**

### RECEIPT BY INSTITUTIONAL GRIEVANCE COORDINATOR

**Date Received** 20050706 **Decision Date** 20050714

**Signature** Aucoin Ann Marie CO I

**Final Decision** DENIED

**Decision** Through your own admission in this grievance, your property was in possession of another inmate at the time of your transfer to ten block therefore is not listed on your exiting inventory. The institution is not responsible for items not present in your cell at the time the inventory is conducted. On your inventory, it indicates 3 books. Proeprty officer was contacted and informed this office that the 3 books were forwarded to you in Ten Block.

**Signature** Ann Marie Aucoin [signature] **Date** 7/14/05

Denied grievances may be appealed to the Superintendent within 10 working days of Institution Grievance Coordinator's decision.

### INMATE RECEIPT

**Name** NIEMIC KEITH **Institution** MCI CEDAR JUNCTION

**Commit No.** W61426 **Grievance#** 11699 **Date Received** 20050706

EX-4

# COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF CORRECTION
### INMATE GRIEVANCE FORM
### FORWARD TO INSTITUTIONAL GRIEVANCE COORDINATOR (IGC)

**Name** NIEMIC KEITH **Grievance#** 11617 **Institution** MCI CEDAR JUNCTION

**Commit No.** W61426 **Housing** TEN BLOCK **Date Of Incident** 20050613 **Date Of Grievance** 20050628

**Complaint** Sgt Mulbey of the IPS did take from my person-myaddress book and 21 stamps (.37) that which contains all my family phone numbers and addresses, including attorney addresses and phone numbers and business cards. Sgt Mulvey stated, upon my hesitency to turn over my address book that eh'll see about getting it back to me the next day. As of the present date, I still am unable to contact my lawyer or family members concerning my health and well being. As I am also denied the priviledge of exchanging phone numbers pursuant to inmate telephone system, and denied my right to U.S. mai, or my right to lawyer/family because Mulvey still has not returned my address book.

**Remedy Requested** To be given my address book with stamps, so that I can enjoy my right to counsel and enjoy my privilege of adding and deleting phone numbers to my pin sheet.

**Staff Recipient** Aucoin Ann Marie CO I

**Staff Involved** Mulvey Patrick M CO II

**Signature**

---

### RECEIPT BY INSTITUTIONAL GRIEVANCE COORDINATOR

**Date Received** 20050705 **Decision Date** 20050707

**Signature** Aucoin Ann Marie CO I

**Final Decision** Approved

**Decision** The address book is being returned to you from the IPS unit.

**Signature** [signature] **Date** 7/7/05

**Denied grievances may be appealed to the Superintendent within 10 working days of Institution Grievance Coordinator's decision.**

---

### INMATE RECEIPT

**Name** NIEMIC KEITH **Institution** MCI CEDAR JUNCTION

**Commit No.** W61426 **Grievance#** 11617 **Date Received** 20050705

**Signature.** Aucoin Ann Marie CO I

EXHIBIT 4

KEITH NIEMIC W61426
SBCC SMU J3 #6
PO BOX 8000
SHIRLEY, MA 01464

NO SUCH NUMBER

RETURN TO SENDER

MIDDLESEX-ESSEX MA 018
24 SEP 2005 PM

RETURN TO SENDER
ATTEMPTED NOT KNOWN / INSUFFICIENT ADDRESS / UNABLE TO FORWARD

JONATHAN NIEMIC c/o Mary Coughlin
HAWTHORNE St.
[illegible] MA

MAILED: 9-22-05

6

1 of 5
1 Purchase slip

464/8000



Keith Niemic W61426
SBCC SMU J-3 #6
PO Box 8000 Shirley, MA 01464

9-1-05

Mr. Gillette property dept. walpole
PO Box 800
South walpole, MA 02071

Re: assistance/clarification property matter

Dear Mr. Gillette,

would you please cross out the sexual explicit body parts on pg 16, of my AMERICAN CURVES MAGAZINE, and send it to me at SBCC.

Also, on other property matters, Please Note:

A) I have a color T.V. at walpole, that is not marked on any of my current records (copies).

would you please properly (locate &) record my T.V. sending me copy of its reciept.

B). In re: 3rd contraband Notice of fan, ("allegedly broken")
my fan does work, please remove and dispose of the external component inside the casing that block metal (ONLY) and put my fan in long term storage, and

C). My name is on (2) pair sony headphones, (1) sentry table radio, and (1) Aiwa walkman that is purchased and owned by me, in which I have all reciepts. all of which is being

EX-9

withheld from me, by three mere words written on contraband form "all not yours".

Mr. Gillette, completely understanding ~~at~~ fam how hectic the property job is but please understand that I'm not only indigent, with No family, but I am also a lifer, who at the present moment hasnt even had his well documented color K-TV, marked on any of my property slips.

So please help me to understand, is it by this same inadvertence that other well documented property, (2) headphones (1) Radio (1) walkman, can be disposed of based upon mere allegation only? I'd at least hope not in my case, for the reasons above. So would you please be so kind as to put all of these items:

- (locate & record) COLOR T.V.
- Fan
- 2 Sony headphones
- 1 sentry table radio
- 1 Aiwa walkman

BIN 3-B

into long term storage, all of which ~~[illegible]~~ is to be returned to me upon my return back to walpole. I would be most grateful for your understanding and help, sending only American Curves to me here.

Thank you

Sincerely

Keith [signature]

copy: file

Ex 4/10/1/4
5

# MCI CEDAR JUNCTION APPLIANCE ORDER FORM

NAME ______________________ ID#____________

HOUSING UNIT ______________ DATE____________

| QTY. | CODE | ITEM | COST |
|---|---|---|---|
| | 799 | ZENITH 13" COLOR TELEVISION | $169.31 |
| | 800 | KTV 12" BLACK & WHITE TELEVISION | $122.06 |
| | 801 | KTV 13" COLOR TELEVISION | $196.75 |
| | 802 | SENTRY HEADPHONE | $8.53 |
| | 803 | SONY HEADPHONE | $29.54 |
| | 804 | FAN | $26.25 |
| | 805 | BROTHER ML100 TY | $145.69 |
| | 806 | S.C. TYPEWRITER R | $8.24 |
| | 807 | S.C. CORRECTABLE | $4.94 |
| | 810 | JENSEN AM/FM RAI | $23.63 |
| | 811 | SENTRY TABLE RAI | $26.25 |
| | 813 | MONO TO STEREO ADAPTER | $1.45 |
| | 822 | BROTHER REPL. RIBBON (1 PACK) | $5.12 |
| | 823 | BROTHER CORR. RIBBON (2 PACK) | $5.12 |
| | 826 | CANNON REPL. RIBBON | $4.60 |
| | | | |
| | | | |

Appliance Form

Att: C

INMATE SIGNATURE____________________________

UNIT TEAM/CPO SIGNATURE____________________

PROPERTY SIGNATURE ________________________

INMATE ACCOUNTS SIGNATURE _______________

AMOUNT DEDUCTED $______________

4C

Massachusetts Department of Correction

# PROPERTY CONTRABAND NOTIFICATION AND DISPOSAL FORM

INSTITUTION: MCI C.J.

☐ *REMOVAL OF PROPERTY REQUESTED BY INMATE*

INMATE: Keith, Niemic COMMITMENT #: W61496 ☑ FIRST NOTICE: 11/12/05 *(Date)*

**The following items have been deemed contraband and are not allowed in this facility.**

1. 5 Books
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26.
27.
28.
29.
30.
31.
32.
33.
34.
35.
36.
37.
38.
39.
40.
41.
42.
43.
44.
45.
46.
47.
48.
49.
50.
51.
52.
53.
54.
55.
56.
57.
58.
59.
60.

**These articles must be disposed of in accordance with 103 CMR 403.14. Please select a method of disposal.**

***I choose to have my property...*** **Cost to mail: $ .**

☐ retrieved by a visitor. ☐ mailed out to a specified destination. ☐ disposed of as seen fit by the institution.

| Retrieved by a visitor | Mailed out |
|---|---|
| Name | Name |
| Address | Address |
| City State Zip | City State Zip |
| Telephone | Telephone |

***Inmate Authorization:*** ______________________ ***Date:*** ______________

**Property Pick-up Acknowledgement**

*Visitor ID:* ☐ valid state ID/drivers license ☐ military ID ☐ passport ☐ Dept. Transitional Assistance (Welfare ID)

EXHIBIT B7

Massachusetts Department of Correction

# PROPERTY CONTRABAND NOTIFICATION AND DISPOSAL FORM

INSTITUTION: CJ

☐ REMOVAL OF PROPERTY REQUESTED BY INMATE

INMATE: Keith Niemic COMMITMENT #: W61426 ☑ FIRST

Date 8-3005

The following items have been deemed contraband and are not allowed in t

1. (1) fan — 21. broken
5. (2) prs. Sony headphones
8. (1) Sentry 28. table radio
11. (1) Aiwa 31. walkman

(Date)

These articles must be disposed of in accordance with 103 CMR 403.14. Please selec

In accordance with 103 CMR 403.14, you are being issued a final notice to have your contraband property items listed above disposed of by a method of your choice as indicated. If you do not respond to this notice in writing within thirty (30) days of the final notice date, the contraband items will be disposed of as seen fit by the institution.

☐ No response from inmate.

Property Officer: ______

Date Disposed of: ______

White - Property (Original) Green - Inmate (First Notification) Canary - Inmate (Final Notification) Pink - Visitor (Mail/Pick Up) Gold - Inmate (Final Disposition)

*I choose to have my property...*

☐ retrieved by a visitor. ☐ mailed out to a specified destination. ☐ disp

Name ______ Name ______

Address ______ Address ______

City ______ State ______ Zip ______ City ______ State ______ Zip ______

Telephone ______ Telephone ______

*Inmate Authorization:* ______ *Date:* ______

**Property Pick-up Acknowledgement**

*Visitor ID:* ☐ valid state ID/drivers license ☐ military ID ☐ passport ☐ Dept. Transitional Assistance (Welfare ID)

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court**

CIVIL DOCKET#: **SUCV2005-00028-D**

RE: Niemic, W61426 v Allen Supt et al

TO: Keith Niemic, W61426
MCI Cedar Junction
PO Box 100
South Walpole, MA 02071

## NOTICE OF DOCKET ENTRY

You are hereby notified that on **07/27/2005** the following entry was made on the above referenced docket:

**JUDGMENT OF DISMISSAL FAILURE TO COMPLY WITH ORDER That the complaint is hereby dismissed without prejudice entered on docket pursuant to Mass R Civ P 58(a) and notice sent to parties pursuant to Mass R Civ P 77(d) Cratsley J**

Dated at Boston, Massachusetts this 27th day of July, 2005.

Michael Joseph Donovan,
Clerk of the Courts

BY: Jane M. Mahon
Assistant Clerk

Telephone: 617-788-8110

cc:
Faugere

**Disabled individuals who need handicap accommodations should contact the Administrative Office of the Superior Court at (617) 788-8130**

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court**

Civil Docket **SUCV2005-00028**

RE: Niemic, W61426 v Allen Supt et al

TO: Keith Niemic, W61426
MCI Cedar Junction
PO Box 100
South Walpole, MA 02071

**CLERK'S NOTICE**

This is to notify you that in the above referenced case the Court's action on **06/09/2005**:

*RE: ORDER: NOTICE OF WAIVER OF COURT COSTS AND REQUEST FOR PAYMENT TO BE WITHDRAWN FROM ACCOUNT (PURSUANT TO G.L. c. 261 sec. 29) The prisoner/plaintiff in the above-captioned action has filed a motion to waive the filing fee of $275.00 and court costs (normal) and to proceed in forma pauperis. After reviewing the affidavit of indigency and the statement of inmate account provided by the correctional facility, the court hereby orders: The plaintiff is ordered to pay a lump-sum payment of $60.00 in order to proceed. The court further finds that requiring additional installment payments would create an undue administrative burden for the court. The prisoner's name and case number MUST be noted on each remittance. Payment is to be made by way of check or money order payable to the Suffolk Superior Court Clerk by 03/28/2005. Payment should be mailed to : SUFFOLK SUPERIOR CIVIL CLERK'S OFFICE, SUFFOLK SUPERIOR COURT, JOHN W. MCCORMACK POST OFFICE & COURTHOUSE, 90 DEVONSHIRE STREET, ROOM 810, BOSTON, MA. 02109 . By the Court (Charles J. Hely, Justice) (dated 02/24/2005) Notice Sent 02/28/2005.*

**is as follows:**

**ORDER (P#7) Upon review by the court of plaintiff's canteen account plaintiff is ordered to pay $10.00 as a partial filing fee. The above sum in this order was an incorrect assessment. Plaintiff has until July 9, 2005 to make this payment as requested above. (Cratsley, Justice) Notice Sent 06/09/2005.**

Dated at Boston, Massachusetts this 9th day of June, 2005.

Michael Joseph Donovan,
Clerk of the Courts

BY:

Elaina M. Quinn
Assistant Clerk

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS. SUPERIOR COURT CIVIL ACTION
No. 05-0028

KEITH NIEMIC,
Plaintiff,
v.

MICHAEL MALONEY and
PETER ALLEN,
Defendants.

PLAINTIFF'S MOTION FOR LEAVE FOR RELIEF FROM JUDGMENT OR ORDER

The plaintiff does move that the court (Cratsley, J.) pursuant to MASS. R. CIV. P. Rule 60(b)(1)(3) and (6) hereby allow plaintiff's motion, and thus vacating prior Judgment of dismissal.

For reasons therefore, Plaintiff does briefly state (the material facts of which are set forth in detail, in the attached affidavit.) On June 9, 2005 the Court (Cratsley, J.) did order, upon review of the case that plaintiff was to pay a partial filing fee of $10.00, to be paid by July 9, 2005, as ordered by the Court.

On June 13, 2005 plaintiff was stabbed several times while in an altercation with another inmate in 7-block (DSU) of walpole.

While plaintiff was recieving medical treatment, A prison employee, Pat Mulvey, of the Inner Perimeter Security ("IPS") who was served a summons and complaint by the plaintiff on June 6, 2005 did take from the plaintiff his personal address book and 21 stamps therein, who then placed plaintiff in 10 Block segregation where plaintiff was subsequently placed in the Hospital Segregation Unit (HSU) for 10 days. The confiscation and deprivation of his address book and stamps denied him the ability to call or write

his family, some of whom had recently moved, wherein he would have sought assistance in paying the $10.00 fee before July 9, 2005 as ordered.

For the facts set forth in the attached affidavit, and the reasons illustrated herein, Plaintiff has a prima facie case with chance for success on the merits. Parrell v. Keenan, 389 MASS. 809. 815 (1983), he has acted promptly after entry of judgment to assert claim for relief therefrom. MASS. R. CIV. P. Rule 60 (b) Averbuck v. Stoller, 4 MASS. APP. Ct. 791 (1976), and has set forth facts seeking relief, which illustrates excusable neglect that was not due to his own carelessness.. see Cullen Enterprises Inc v. MASS. Property Insurance Underwriting Ass'n; 399 MASS. 886, 894 (1987); and who further set forth facts in his previous motion for Default Judgment (affidavit), as well as the current affidavit herein that actions by the defendants, including conduct of D.O.C. employee's who were once closely associated to the defendant[s] rise to the level of deliberate and calculated plan to use the judicial system in a fraudulent manner. Pina v. McGill Development Corp., 388 MASS. 159. 168. (1983);

WHEREFORE; for the reasons, and facts set forth herein plaintiff respectfully requests that this Honorable court grant him relief from judgment.

Respectfully Submitted

8-8-05 [signature]

Keith Niemic
SBCC SMU J-3
PO BOX 8000
Shirley, MA 01464

certificate of service

I do hereby state that a true copy of the above has been served upon attorney for the defendants on this day 8-8-05 by regular mail
[signature]

AFFIDAVIT OF KEITH NIEMIC

I Keith Niemic, hereby depose and state that the following is a true statement of facts to the best of my knowledge and memory:

1. I am plaintiff in the above entitled matter who did effectively make service of process upon Pat Mulvey and several others at MCI-Cedar Junction ("walpole") by the United States Marshals Service on June 8, 2005 for alleged civil rights violations CIV. AC. No. 04-11482 (see EXHIBIT 1, attached Process Reciept and return) unrelated to the present case.

2. Approximatly on June 13, 2005 the plaintiff did recieve several stab wounds and a herniated disk from an altercation with another inmate, whereupon after plaintiff recieved medical treatment walpole employee Pat Mulvey did take his address book containing 21 stamps and placed him in 10 Block where plaintiff was unable to contact any of his family so that he could request that $1000 be sent to the clerk of court regarding the courts order on June 9, 2005.

3. Approximately on June 9, 2005 the court (Gratsley, J.) did order that plaintiff in the present case CIV. AC. No. 05-00028 was to pay a reduced partial filing fee of $10.00 by July 9, 2005.

4. On July 9, 2005 plaintiff was moved to the Health Services Unit (HSU) in walpole due to a herniated disk, and remained there until July 18, 2005.

5. On June 28, 2005 plaintiff filed a grievance for the confiscation of his address book, that was approved, however further resulting in plaintiff appealing such matter to the superintendent of walpole on July 28, 2005 because the address book was never returned to him (See EXHIBIT 2, attached grievance and appeal)

6. On July 26, 2005 plaintiff, among several other inmates in 10 Block were all shipped to SBCC in Shirley MASS. in which plaintiff is missing (4) boxes of pertinant legal material.

7. Approximately on July 28, 2005 plaintiff filed with this court MOTION FOR DEFAULT JUDGMENT relying in part by defendants Michael Maloney, and Peter Allen's fraud on the court.

8. walpole employee Pat Mulvey who is (IPS) did knowingly and intentionally seize plaintiffs address book and 21 stamps on June 13, 2005 after plaintiff was stabbed as retaliation for serving summons and complaint on him on June 8, 2005.

9. As of the present date August 8, 2005 I have still not recieved my address book and 21 stamps from Pat Mulvey, and had I had access to it I would have contacted my family some of whom have recently moved and requested their assistance in paying the $1000 filing fee, the deprivation of which has denied me from paying such fee timely.

10. upon this courts granting of my motion for relief from Judgment I will have a $1000 check sent to the court within 30 days, as I did recently receive correspondence from a family member with a return address listed on the envelope.

11. The verified complaint in this action, being brought pursuant to MGL c 260 § 2 with respect to Defendants Maloney and Allen's breach of Hoffer v. Fair, SJC # 85-71 class consent decree stipulation contracts to fully comply with 103 CMR 421 due process for all segregation unit prisoners at walpole; and also brought pursuant to MGL c 231A § 5, contempt of Hoffer class order # 11 order and Judgment #17 and judicially created jurisdiction for the underlying constitutional Hoffer order # 11 basis for such regulations LAWNE v. SUPERINTENDENT, 406 MASS 156, 160 (1989) being violated id., is a prima facie case for relief being sought, as illustrated by the majority opinion in Haverty v. Commissioner, 437 MASS 737 (2002);

12. Pat Mulvey did work under Peter Allen at walpole approx. in 2000-01.

SIGNED UNDER THE PAINS AND PENALTIES of PERJURY

8-8-05 [signature]
Keith Niemic