## ☐ I.V. administration

• Drug should be administered only by persons trained in the use of I.V. anesthetics.

• Give drug by direct I.V. injection. Drug has been given by intermittent I.V. infusion, but drug compatibility and stability in I.V. solutions aren't fully known.

## PATIENT TEACHING

• Inform patient and family of need for drug and answer any questions

• Encourage turning, coughing, and deep breathing postoperatively to prevent atelectasis.

## tramadol hydrochloride
Ultram, Zamadol§, Zydol§

*Pregnancy risk category C*

## HOW SUPPLIED
*Tablets:* 50 mg

## ACTION

Unknown. A centrally acting synthetic analgesic compound not chemically related to opiates. Drug is thought to bind to opioid receptors and inhibit reuptake of norepinephrine and serotonin.

| Route | Onset | Peak | Duration |
|---|---|---|---|
| P.O. | Unknown | 2 hr | Unknown |

## INDICATIONS & DOSAGES

*Moderate to moderately severe pain—*

**Adults:** 50 to 100 mg P.O. q 4 to 6 hours, p.r.n. Maximum, 400 mg daily.

**Elderly patients:** For patients over age 75, maximum is 300 mg daily in divided doses.

**Adjust-a-dose:** For renally impaired patients with creatinine clearance below 30 ml/minute, increase dose interval to q 12 hours; maximum is 200 mg daily. For patients with cirrhosis, give 50 mg q 12 hours.

## ADVERSE REACTIONS

**CNS:** *dizziness, vertigo, headache, somnolence,* CNS stimulation, asthenia, anxiety, confusion, coordination disturbance, euphoria, nervousness, sleep disorder, *seizures,* malaise.

**CV:** vasodilation.

**EENT:** visual disturbances.

**GI:** *nausea, constipation, vomiting,* dyspepsia, dry mouth, diarrhea, abdominal pain, anorexia, flatulence.

**GU:** urine retention, urinary frequency, menopausal symptoms, proteinuria, increased creatinine clearance.

**Hematologic:** decreased hemoglobin levels.

**Hepatic:** increased liver enzyme levels.

**Musculoskeletal:** hypertonia.

**Respiratory:** *respiratory depression.*

**Skin:** pruritus, diaphoresis, rash.

## INTERACTIONS

**Drug-drug.** *Carbamazepine:* Increases tramadol metabolism. Patients receiving long-term carbamazepine therapy at up to 800 mg daily may need up to twice the recommended dose of tramadol.

*CNS depressants:* Additive effects. Use together with caution. Dosage of tramadol may need to be reduced.

*Cyclobenzaprine, MAO inhibitors, neuroleptics, tricyclic antidepressants:* Increased risk of seizures. Monitor patient closely.

*Quinidine:* Increased levels of tramadol. Monitor patient closely.

## EFFECTS ON DIAGNOSTIC TESTS

None reported.

## CONTRAINDICATIONS

Contraindicated in patients hypersensitive to drug and in those with acute intoxication from alcohol, hypnotics, centrally acting analgesics, opioids, or psychotropic drugs.

## NURSING CONSIDERATIONS

• Use cautiously in patients at risk for seizures or respiratory depression, in increased intracranial pressure or head injury, acute abdominal conditions, or renal or hepatic impairment, and in physical dependence on opioids.

• Monitor CV and respiratory status. Withhold dose and notify prescriber if respirations decrease or rate is below 12 breaths/minute.

• Monitor bowel and bladder function. Anticipate need for laxative.

*Reactions may be common, uncommon, life-threatening, or COMMON AND LIFE-THREATENING.*

better analgesic effect, give drug before onset of intense pain.

• Monitor patients at risk for seizures.

• Drug may reduce seizure threshold.

• Monitor patient for drug dependence. Drug can produce dependence similar to that of codeine or dextropropoxyphene and thus has potential for abuse.

## PATIENT TEACHING

• Tell patient to take drug as prescribed and not to increase dose or dosage interval unless ordered by prescriber.

• Warn ambulatory patient to be careful when rising and walking. Warn outpatient to avoid driving and other potentially hazardous activities that require mental alertness until drug's CNS effects are known.

• Tell patient to check with prescriber before taking OTC drugs; drug interaction can occur.

*Liquid contains alcohol.    **May contain tartrazine.    †Canada    ‡Australia    §U.K.    ◇OTC*

## AFFIDAVIT OF DANIEL MASON

I Daniel Mason hereby depose and state that the following is a true statement of facts to the best of my knowledge and memory:

1. I Daniel Mason, do have personal knowledge of the facts set forth herein and can testify to such in a court of law.

2. I have a B.A. from Dartmouth College, where I completed a pre-medical curriculum, with five years medical school experience gained on rotations as a medical student at Boston University Hospital, Boston City Hospital (both have merged and now called the Boston Medical Center), Boston VA Hospital, Franciscan Children's Hospital and North Shore Hospital.

3. I completed most all of the medical school curriculum successfully including but not limited to the following courses and clinical rotations; chemistry, pharmacology, microbiology, physiology, pathology, histology, gross anatomy, infectious disease, neurology, epidemiology and medical ethics, in which I was directly involved in the treatment and care of thousands of patients for over two years as a member of many hospital medical teams, including patients with in factious diseases such as hepatitis, specifically types A, B and C, and their genotypes.

4. Two weeks prior to finding out if my residency would be in Emergency Medicine, or Surgery, and two months prior to my graduation in May 2001, I was arrested and convicted in the Massachusetts Department of Corrections.

5. In clarification of the factual assertions set forth herein, I will make reference to the following authorities as a footnote, abbreviated as (fn. & no.) As chronologically listed: Numbers 1 through 9 footnotes.

1.Neuman AV, Lam NP, Dahari H, et al Differences in Viral Dynamics between Genotypes 1 and 2 of Hepatitis C Virus. J Infectious Disease 2000; 182:28-35

2. Schevr PJ. Classification of chronic viral hepatitis: a need for reassessment J Hepatol 1991:13:372-4

3. Italian Association for the study of the liver. Guidelines: online final statement. (Accessed May 31, 2005, at http://www.webaisf.org

4.Alessandra Mangia et al. Peginterferon Alfa-2b and Ribavarin for 12 vs. 24 weeks in HCV Genotype 2 or 3. New England Journal of Medicine 2005:352,No.25: 2609-17

5. Hepatitis C – Complete Health Information regarding HCV on Medicine Net.com, at http://www.medicinenet.com (accessed November 3, 2005) Medical Author: Tse-Ling Fong, M.D., Medical Editor: Leslie J. Schoenfield, M.D., Ph.D.

6. Ishak K, Baptista A, Bianchi L, et al. Histological grading and staging of chronic hepatitis. J Hepatol 1995:22:696-9.

7. McHutchinson JG, Manns M, Patel K, et al. Adherence to combination therapy enhances sustained response in genotype 1 infected patients with chronic hepatitis c. Gastroenterology 2002:123:1061-9

8. Zeuzem S, Pawlotsky JM, Hagai E, et al. International, muticenter, randomized, controlled study comparing standard verses dynamically individualized treatment in patients with chronic hepatitis c (DITTO-HCV project).Hepatology 2003:38: JPA.abstract.

9. Fried MW, Schiffman ML, Reddy KR, et al. Peginterferon alfa-2a plus ribavarin for chronic hepatitis c virus infection. New England Journal of Medicine 2002:347:975-82

6. Fiorinol. contains butalbital, aspirin and caffeine and is a strong non-narcotic pain reliever and muscle relaxant, is prescribed for the relief of tension headaches symptoms caused by stress…Thomson V Physicians Desk reference 2nd Edition Drug Guide for Mental Health Professionals, page 535.  Fioricet contains butalbital acetaminophen and caffeine and is a non-narcotic pain reliever and muscle relaxant, Thomas PDR 2nd Ed. Pg. 534.

7. Midrin, containing isometheptene, dichloralphenazone, and acetaminophen and is prescribed for treatment of tension headaches… "Thomson PDR 2nd Ed. Pg 567"…chronic use of acetaminophen is associated with liver damage acute acetaminophen overdose can potentially result in fatal liver toxicity…"Thomson PDR 2nd Ed. Pg 337.

8. There are several genotypes of Hepatitis C (Hep C) and genotype 1a is generally known as the most virulent (as opposed to genotypes 2&3). (*fn 1,2,3,4).

9. The progression of chronic Hep C infection is based upon estimates generalized from numerous retrospective & prospective studies (*fn 5).  Generally, it takes 10 – 14 years from when Hep C is contracted until evidence of chronic Hep C is seen on biopsy, 20 years to develop cirrhosis and 28 years to develop liver cancer (barring factors that can accelerate this process).  This is based on retrospective studies. (*fn 5).

10. Prospective studies suggest that 10-25% of Hep C patients develop cirrhosis within 10-15 years, while only 10% of chronic Hep C patients develop symptoms related to their liver disease. (*ft 5).

11. The combination of retrospective and prospective studies suggests a natural progression of the disease is slow and that generally complications develop over decades. (*fn 5.6).

12. Retrospective/prospective studies suggest that once cirrhosis is established the risk of developing complications of liver failure grow at a rate of about 10% per year. (*fn 5,6,2,3).  And the risk of developing liver cancer grows at a rate of 1.4% per year. (*fn 5.6).

13. For patients without complications from cirrhosis the 10-year survival rate is about 80%, while for those with such complications the rate is less then 50% at 5 years (*fn 5).  Put differently, 20 out of 100 patients will die within 10 years, and 50 out of 100 patients will dies within 5 years respectively.

14. The level of virus in the blood (Viral load) does not correlate with disease severity. (*fn 5).  Severe disease may show a low viral load.

15. Combination therapy of interferon and a nucleoside analogue are currently the mainstay of treatment in the U.S.A. (*fn 9,8,7,5,4,3) and is still the standard of care (*fn 5) and are more effective especially with genotype 1 (*fn 9,8,7,5,4,3).

16. The sustained response (SR) of combination therapy for patients with the Hep C genotype 1 is 30% (half of the SR of genotypes 2 or 3). (*fn 5). This further emphasizes the virvliance and need for treatment for patients with genotype 1.

17. The (SR) is the ongoing desired effect of treatment after the completion and cessation of treatment as measured by the patient's blood viral load.

18. In contrast to patients with genotypes 2 &3, those with genotype 1 benefited from 48 weeks (as opposed to only 24) of treatment and it appears to include those genotype 1 patients with low viral loads. (*fn 9,8,7,5,4,3). Again, this further emphasizes the virulence of genotype 1 (since it requires twice the treatment time of genotypes 2&3 to achieve SR), and it benefits genotype one's with low viral load, which suggests a benefit to early treatment.

19. The predictors for a SR involve factors such as the genotype of the virus, the viral load in the blood, the microscopic appearance of the liver tissue (fibrosis & severity thereof), and certain patient characteristics such as:

    - Genotype
    - Viral load below 2 million copies/ml
    - Absence of cirrhosis
    - Female gender
    - Age less than 40 years
    (*fn 5.3)

20. Patients receiving combination therapy should have a qualitative Hep C virus RNA PCR (Polymerase Chain Reaction) measured at 24 weeks and if they are positive for the virus should only then stop treatment as this is predictive of little chance of achieving a SR. (*fn 5,4).

21. Any individual with chronic Hep C infection is a candidate for antiviral therapy; however in weighing the risks and benefits of treatment the National Institute for Health (NIH) consensus development conference recommends treatment for those patients at greatest risk for cirrhosis. These patients have the following characteristics.

    - Persistent ALT elevation
    - Detectable Hep C virus RNA
    - Evidence of fibrosis or biopsy of liver
    - Evidence of moderate inflammation and liver well injury on liver biopsy.
    (*fn5,3,6)

22. A person can have significant underlying liver disease with Hep C; yet have no symptoms, abnormal laboratory findings, or abnormal physical findings. (*fn 5).

23. Liver biopsy provides information of severity and, therefore the outcome (prognosis) of the aforementioned liver disease. (*fn 5,6,3,)

24. Liver biopsy can provide information of a predictive value as to whether a person is likely to progress to cirrhosis within 10 years (8fn 5.6.3).

25. Consequently, liver biopsy can help determine the risk benefit assessment of starting antiviral therapy (*fn 5). However, not all liver specialists agree that liver biopsy is necessary or required prior to starting therapy, and this provides for the start of said therapy for patients who otherwise (i.e. other than biopsy) are suitable canidates for treatment without biopsy (Fn.5)

26. One would not treat the following individuals with antiviral therapy:
   • Active users of illicit drugs
   • Active users of alcohol
   • Patients with major depression
   • Patients with low blood counts
   • Patients with untreated thyroid disease
   • Patients with autoimmune disease
   • Recipients of solid organ transplants
   • Other serious medical conditions
   • (*fn 5)

27. Essentially, antiviral treatment for chronic Hep C should be tailored to the individual with careful consideration of the risks and benefits (*fn 5).

28. Side effects of combination therapy are unpleasant and common. (*fn 5,8,3). Among those side effects approximately 25-35% suffer from headaches (*fn 5,4,8) and alone or in combination with other side effects causes approximately 10% of patients to discontinue antiviral therapy (*fn 5,4)

29. The liver acts essentially as a detoxifier in relation to chemicals that are produced in or otherwise introduced into the human body. It can perform this task for thousands of chemicals when the liver is healthy. However, when overburdened, even a healthy liver can sustain damage and varying degrees of decreased ability to perform its critical chemical tasks. How much more so for patients with liver diseases such as chronic Hep C virus. In such patients the definition of a hepatotoxin becomes greatly narrowed, and infinitely greater care and consideration must be given to protect the liver from substances that in the context of their disease can be damaging or even fatal.

30. Among such substances contraindicated and should be avoided for such patients are alcohol as well as Tylenol and Motrin and substances that cause the activation of the liver's cytochrome P450 system. Activation of the cgt. P450 system is not entirely avoidable as it's a part of the livers "normal" functions. However, such activation can and must be dramatically reduced wherever possible, and what's more, if such activators are ever purposely introduced for medical purposes it should only be done in absence of an alternative and as seldom as possible.

31. Introduction of hepatotoxic substances/all medications into a patient's (with chronic Hep C) medical regimen when viable alternate medications can be used, is poor medical practice, bordering on malpractice and a violation of medical ethics, and can result in liver damage or even death.

32. It may not always be possible to avoid the introduction of an hepatotoxic medication into the medication regimen of a patient with chronic Hep C and whenever this is done one must give careful consideration to the risk-benefit aspect which consists of both objective and subjective criteria and for this reason must be discussed with the patient so that he can make an informed decision because an important aspect of the subjective criteria in particular are the patient's thoughts and feelings. Such patient involvement in his own

4

care is one of the most fundamental standards of practice and care in medicine and in this regard is identical for civilians and prisoners alike.

33. The level of caution is elevated even further for possible introduction of hepatotoxic medication into the medication regimen of a chronic Hep C patient the longer the elapsed time (in years) since contracting the disease especially when a liver biopsy evaluation (for staging liver damage) is not available to assess the patient's baseline liver damage for prognostic and treatment purposes. In such instances one errs on the side of caution and, to do so it standard medical practice.

34. Mr. Keith Niemic gave me a copy of part of his extensive medical records for my review at his request and my personal knowledge of his care and treatment is derived from those records as well as a self-report of his medical history where relevant and in lack of his earlier records.

35. Mr. Niemic was diagnosed with Hep C genotype 1 in 1997, the most virulent genotype.

36. He began pegylated interferon with ribavarin (combination therapy) antiviral treatment in January 2001.

37. The record reveals that he discontinued treatment after about 20 weeks (5 months) instead of the recommended 48 weeks due to "severe headaches" (HA).

38. Four years after treatment cessation the records indicate a decrease in the patient's viral load to the 30,000 IU/M (International Units/Milliliter) from a self-reported pre-antiviral treatment range of approximately 1,800,000 IU/ml. So although the patient's antiviral treatment ended prematurely, the viral load of the Hep C virus in his blood was dramatically reduced indicating a positive response to treatment. What's more that tab value is from approximately 4 years status-post his incomplete antiviral treatment which supports some degree of significant SR ("Sustained Response" to treatment) although not quite at the undetectable level desired.

39. The patient should probably have a liver biopsy to stage his liver damage (if any) as 10-25% of chronic Hep C patients develop cirrhosis within 10-15 years and many of them do not show signs or symptoms of that damage. Currently, the extent of damage to this patient's liver remains unknown.

40. The patient is going on his 10th year since diagnosis (and one must bear in mind that he may have been infected a considerable number of years prior to diagnosis), and is of genotype 1 and elevated liver enzymes all, which support a liver biopsy evaluation.

41. The patient's record indicates liver enzyme elevations in 3 separate tests spanning dates of, 27 October 2004 to 8 April 2005. The elevations of his AST & A LT are mild (compared to common elevations seen at 2-3x normal). However, any elevation at all is currently considered one of several criteria for anti-viral treatment when said elevations are persistent. The patient's liver enzymes have been persistently elevated.

42. The patient's record reveals multiple sick slips submitted and complaining of "severe HA" both during his antiviral treatment for Hep C in 2001 and right up to the present in 2005.

43. Between 2004-2005 the patient was twice sent to the Lemuel Shattuck Hospital (LSH) for the evaluation of his headaches by Doctor Kramer, a neurologist, in which he records Mr. Niemic's want for effective HA management to coincide with anticipated Hep C treatment.

44. Dr. Kramer, prescribed numerous medications trials, some of which were already on record as being tried and ineffective ex*HIBIT* 3 _____ wherein the medical records reveal that treatment with *uHram* during Mr. Niemic's Hep C treatment appeared to be most effective in treating HA, ex. __3_____, as this patients records do show that Dr. Kramer's prescription of fiorinal and imitrex may have also been effective had the patient been allowed to continue such prescribed treatment.

45. The record also reveals that during the period of 2004-2005 the patient was seen numerous times by D.O.C. nurse Practitioner (NP) Kathy Stout and Carl Singletary M.D., for complaints of "severe headaches" in effective pain relief thereof and his desire to restart combination therapy for his Hep C as soon the HA treatment proved effective. Exhibit __1_____, as the antiviral treatment exacerbates his HA, ex. __4____

46. The record reveals that the patient did not get pain relief from medication trials prescribed by NP Kathy Stout and Dr. C. Singletary. This is evidenced by his numerous sick slips submitted over an extended period with complaints about non-relief.

47. The record reveals an adversarial relationship, one that went from bad to worse, between the patient and NP K.Stout and Dr. C.Singletary, Exhibits __1, 2__

48. The record reveals that around or about January, 2005 through April 2005, NP Stout and Dr. Singletary became suspicious of the patients requests for fiorinal for the relief of his HA as well as obvious doubt as to whether the patient was experiencing "severe" or "migraine" HA at all as evidenced by Dr. Singletary's repeated comments that the patient never presented with HA's on exam and that no other evidence such as reported behaviors of the patient in his cell block were found in support of his experiencing migraines. Exhibit __1_____.

49. The record reveals that Dr. Singletary discontinued the patient's fiorinal on January 13, 2005, due to his and NP K.Stouts references to the patient's drug seeking behaviors and past history of substance abuse. Exhibit __1____.

50. The record does not reveal any detail whatsoever about precisely what those "drug seeking behaviors" consisted of. One can only assume that the patient's repeated requests for relief of HA pain and his insistence on fiorinal or ultram as the only medication that gave him relief were the basis for their concern and despite the patients compliance with numerous non narcotic trial medications that gave him no relief. See Exhibit __1__.

51. The record reveals no evidence whatsoever of any current substance abuse. There are merely a few notations by NP K.Stout, that the patient "has a past history of substance abuse". Exhibits __2, 1_____.

52. In lack of any evidence to the contrary it is impossible to derive from the record whether the patient's past history of substance abuse is current or assuming it is true, is nothing other then a problem in the patient's distant past (as measured in years.)

53. The record reveals neither the source to the assertion of the substance abuse contention, nor whether any evidence exists to support it other than the fact that a patient with an extensively documented history of HA/Migraines, who happens to be a convict is requesting relief with an effective medication.

54. The record reveals high doses of Motrin and Tylenol prescribed for the patient by any number of D.O.C. physicians, Exhibit _____ *1, 3* _____. This was offered to him contrary to his whishes concerning both the lack of pain relief and potential damage of said medications can cause his liver. Both the prescription and the patient's wishes to this effect are documented at length, Exhibit _*1, 3, 4*_ _. Further, it was offered for an extensive period of time spanning many months, ex. _*1, 3*_____.

55. It is a fact that medications such as Motrin and Tylenol (and others) are not recommended for patients with liver disease, specifically in this instance, Hep C chronic infection of at least 9 years duration and no liver biopsy to indicate staging of liver damage.

56. It is a fact that Motrin and Tylenol (and others) carry warnings on their labels cautioning their use for patients with hepatic diseases such as hepatitis and that their use if at all be done with caution, only for relatively short durations, and infrequency, Ex._*4*._____

57. It is a fact and a matter of standard guidelines of patient care and treatment to inform the patient of the potential risks/hazards and benefits of treatment.

58. The record does not reveal any discussion with the patient pertaining to the risks or benefits of high dose, long-term treatment of his HA's with Motrin and/or Tylenol.

59. It is my best judgment based upon my medical training that this patient is an appropriate candidate for liver biopsy based upon his meeting many of the recommended guidelines and criteria. This would greatly help with both prognosis and treatment considerations.

60. It is my best judgment based upon my medical training, the current medical literature, the patients record of virulent Hep C genotype (1a), the almost 10 years since diagnosis, his age, his persistent liver function test (LFT) elevation and his positive response to past partial treatment (as measured by his viral load 4 years after discontinuing treatment) with antiviral, that he would benefit from restarting and completing his treatment (48 weeks).

61. It is a fact that, barring any current substance abuse, this patient's disease has a natural history of progression that only gets worse, never gets better and there is no positive medical gain from putting off his treatment any longer.

62. It is a fact that combined pegylated interferon and ribavarin antiviral therapy for Hep C has numerous possible side effects (SE) including headaches. *Ex. 4*_____.

63. It is revealed in the record that Mr. Niemic has a history of migraines going back to childhood, (ex._*1, 3*_____) and had to stop his Hep C antiviral treatment in 2001, 5 months into his 10 month treatment due to "severe" HA's and ineffective HA relief from medications offered to him. ex._*3*_____.

64. It appears to me that the record far from supports a conclusion that the patient IS "drug seeking" or has any current substance abuse whatsoever and, even were it true it does not

mean that he does not truly suffer from said HA's, nor does it mean that he cannot nor should not be given pain relief he claims works for him just because it's a claimed narcotic.

65. Mr. Niemic's medical history of HA's and multiple evaluations by a neurologist who prescribed low dose fiorinal to begin with, all support his medical claim.

66. Further, and even more compelling I have rarely, if ever, seen a young relatively healthy patient who would forego or terminate a potentially life-saving, life-prolonging treatment for a deadly disease just to get a low dose of non-narcotic for a medical complaint of pain they don't really have. Such a patient would have to be either insane, grossly disturbed or an active addict/substance abuser to do this. The medical record does not support any of these conclusions. And, to the contrary, strongly supports the conclusion that the patient's claim may be genuine.

67. It is my best judgment based upon my medical training, the medical literature and the patient's records that given the patient's medical history he may indeed be suffering so badly from his headaches, that he can only tolerate 48 weeks of very unpleasant, but much needed antiviral therapy if he gets HA relief during that period, and the use of even a low dose narcotic during that period with careful monitoring for actual evidence of substance abuse would be appropriate. See exhibit____ 4_____.

68. The gravity of the potential deleterious consequences of indirectly preventing Hep C antiviral treatment for this patient with a known deadly disease, is far outweighed by the treatment benefits to him even if one factors in the possibility that he may be "malingering" and "drug-seeking" (which the record hardly supports) and may have possibly "manipulated" the system into prescribing a low (essentially harmless) dose of a given non-narcotic, especially when there is no evidence in the record of a current drug habit.

69. From a clinical perspective low dose Ultram *or* Fiorinal for his HA over the period of his antiviral treatment would be harmless to the patient and potentially very helpful if in fact he experiences the kind of HA relief that would allow him to tolerate a long and very uncomfortably, but potentially life-saving treatment. So the question now becomes an ethical one in which the proven life-saving potential of treatment must be weighed against the harm of prescribing the low dose of medication this patient requests. From a medical ethics perspective the answer is obvious. Treat the patient along with giving him a harmless dose of pain relief medication at least for the duration of his life-saving treatment.

70. From my experience in medicine, working with all manner of patients with all manner of disorders and diseases, as well as from the medical literature, pain is a subjective thing, can be very difficult to assess and more often than not, goes untreated. Treatment is so often further confounded by other subjective factors such as the "likeability" of a patient or doctor that can sour and distort the doctor-patient relationship and lead to adversarial interactions caused by one or both parties. This must not interfere with a physician's medically sound and ethical judgment and from my review of the record it appears that this may well be just such an instance.

71. There is a wide array of cautionary options left to a physician who suspects that a patient is abusing substances malingering and for Somatizing including all the following which are relatively simple, noontime-consuming steps:

1. Agree with patient upon random urine testing for substance abuse and as a condition for medication.

2. Prescribe any narcotic at the minimally effective dose, and as a PRN thus setting a limit.

3. Prescribe the medication only with a frequency reflective of the number of HA attacks experienced by the patient per week (or month) as supported by his past medical history in the record.

4. Monitor the frequency with which he then takes that PRN medication with special attention toward whether its taken like clockwork and always exhausts the weekly/monthly limits, as HA do not occur on a rigidly set schedule with rigidly frequency set meaning if a patient has HA that are arranged out for their frequency and duration, he may still go days, weeks or months without an attack and a need for the PRN.

5. Monitor the patient with attention to requests for even higher and even more frequent doses of medication.

6. Ask for any reports from staff of evidence of substance abuse (the only way to establish a record).

7. Warn the patient that any current substance abuse or manipulation (i.e. hiding or storing his medication) will lead to the immediate cessation of the medications of concern for a set duration only after which he can be re-evaluated again.

All the above are easy and common steps and in accordance with sound medical judgment. If and when the physician suspect's substance abuse which, incidentally is far more easily and effectively monitored in the highly controlled prison environment then in civilian life.

SIGNED UNDER THE PENALITIES OF PERJURY: _____

Daniel Mason W-70314

This 26th day of November 2005.

9

# CENTER FOR PAIN MANAGEMENT

## Donald S. Stevens MD

Diplomate, American Board of Anesthesiology
Board Certified in Subspecialty of Pain Medicine
By American Board of Anesthesiology

Marlborough Hospital
157 Union St.
Marlborough, MA 01752

(508) 486-5933
FAX (508) 229-1201

1/17/2006

Health care providers at MCI Norfolk

Re: Keith Niemic #545811 (W61426)

Dear Colleagues,

Today this patient returned for his right L4 transforaminal epidural steroid injection.

However, he informed me that on Sun 1/15, he was given ibuprofen by a health care worker, making rounds from cell to cell. He did not know not to take the med, because he cannot know about the timing of his appointments.

Unfortunately, this means that his injection today must be canceled and rescheduled. Ibuprofen is an antiplatelet agent, and can stay in the system for 72 hours. As such, it is my policy NOT to perform elective intraspinal injections unless all antiplatelet agents have been appropriately avoided.

His transforaminal ESI will therefore need to be rescheduled.

**All aspirin-containing products must be stopped for 7 days prior to the procedure, and all NSAIDs other than Tylenol must be stopped for at least 3 days prior to the procedure. This includes 'KOP" medications.**

I would ask that you discuss this with your staff making rounds to dispense analgesics. **Please note also that ibuprofen is NOT listed on his medication administration records. This is a medication record error and in my opinion should be corrected.**

Sincerely,

Donald S. Stevens MD
Medical Director, Center for Pain Management

CC: Dr. Simcha Weller, Beth Israel Deaconess Medical Center – Division of Neurosurgery, 110 Francis Street, Suite 3B, Boston MA 02215
Mr. Keith Niemec, W61426, MCI Norfolk

UMass Memorial Health Care - Marlborough Hospital
157 Union Street, Marlborough, MA 01752
Phone #: (508) 481-5000

**FILE**

CONSULTATION REPORT

Visit: **MM000645947**                    Medrec#: **MM0545811**
Patient: **NIEMIC,KEITH**

Patient: NIEMIC, KEITH
DOB:     06/19/1968

Dictated By:      Stevens, Donald

Admitted Date:    11/14/2005
Discharged Date: //

*Copy for patient*

CONSULTING PHYSICIAN:      Donald Stevens, M.D.

REQUESTING PHYSICIAN:

DATE OF CONSULTATION:      11/14/2005

This is the initial visit at center for pain management for this patient.
He is a 37-year-old man referred by correctional facility health care
providers at Souza-Baranowski Correctional Center, for treatment of right
leg pain. He was seen by Dr. Simcha Weller at Beth Israel Deaconess
Hospital in the past, how recommended right L4 transforaminal epidural
steroid injection. He is referred for evaluation and injection.

The patient states that his pain started June 13, 2005 after an
altercation. He complains of pain somewhat diffusely down his right leg but
it sounds like the majority of the pain starts in the right low back across
from side-to-side, wraps around the right hip to anterolateral thigh, down
to the anterior knee, and then primarily down medial lower leg although
somewhat down lateral lower leg as well. Pain ranges from 6 to 10+ over 10
and now is 6/10. Pain is made worse with walking, sitting, and awakens him
during sleep, all movement and/or exercise. Pain is made better with hot
water treatment, oxycodone, risperidone, p.o. prednisone taper, and
Tramadol. He states his right leg also feels weak. He complains of numbness
along his anterolateral right lower leg, and of tingling down the
anteromedial right lower leg, proximal right thigh across the knee down to
the chin.

He has not had physical therapy. He does do some exercises 2 or 3 days a
week including crunches, reverse crunches, leg lifts and squats.

He has had IM injections only for his pain, no specific nerve blocks. He
has not had chiropractic, acupuncture, herbal medications, counseling to
help with the pain or counseling for any reason. His goal in coming to
clinic is "for pain management in hope of alleviating constant pain and
hope to avoid surgery."

PAST MEDICAL HISTORY:
Illnesses: Migraine headaches, head injury - was assaulted and stabbed in
head, hepatitis C partially treated, anxiety, ADHD.

MEDICATIONS:

Run: 11/16/05-10:03 by interface

CONSULTATION REPORT - Department's copy                    Page 1 of 3

UMass Memorial Health Care - Marlborough Hospital
157 Union Street, Marlborough, MA 01752
Phone #: (508) 481-5000

CONSULTATION REPORT

Visit: **MM000645947**                           Medrec#: **MM0545811**
          Patient: **NIEMIC,KEITH**

1.      Adderall.
2.      Amphetamine.
3.      Citalopram.
4.      Clonidine.
5.      Famotidine.
6.      Mirtazepine.
7.      Tums.
8.      Baclofen.
9.      Hydroxyzine.
10.      Motrin which he keeps on his person, last dose today.

ALLERGIES:
None known except for Benadryl which causes irritability and "discomfort.".

OPERATIONS:
Tonsillectomy, ganglion left wrist.

HOSPITALIZATIONS:
Does not mention other hospitalizations. States immunizations are up-to-date.

SOCIAL HISTORY:
Single, incarcerated since 1995. Previously was a commercial fisherman. He last worked in 1995. Has a high school education. The patient denies alcohol, tobacco or street drugs. He drinks 1 or 2 cups a day of coffee.

FAMILY HISTORY:
No children. Has a sister with chronic pain due to migraines. Father has borderline diabetes. Mother unknown medical history. Siblings - 3 sisters and 1 brother who are healthy, 1 sister with migraines.

REVIEW OF SYSTEMS:
Thirteen systems were reviewed in detail on patient database form. Please see the form for negative findings. Positive findings: General - weight loss, fatigue, loss of appetite, loss of about 5 or 10 pounds in the last few months. Cardiovascular - chest pain, possibly due to stress. GI: Nausea. GU: Slow starting urine stream.

STUDIES AVAILABLE FOR REVIEW ARE AS FOLLOWS:
July 25, 2005 MRI lumbar spine - L4-L5 disk herniation on right side extends superiorly to right lateral recess of L4 extending to right L4-L5 neural foramen, could irritate right L4 nerve root.

PHYSICAL EXAMINATION:
Interview and exam are conducted with 2 correction officers present. Please see patient examination form for details not listed here.
GENERAL APPEARANCE: Normal. Gait is normal.
LOW BACK EXAM: Flexion 95, extension 20, left and right lateral bending 20 cause no symptoms. There is no tenderness over the lumbosacral region.
STRAIGHT LEG EXAM: Negative to 90 degrees bilaterally in sitting, supine

Run: 11/16/05-10:03 by interface

**UMass Memorial Health Care - Marlborough Hospital**
157 Union Street, Marlborough, MA 01752
Phone #: (508) 481-5000

### CONSULTATION REPORT

Visit: **MM000645947**                    Medrec#: **MM0545811**
Patient: **NIEMIC,KEITH**

and hip flexion positions. Muscle strength is 5/5 in all gross motor groups
of all 4 extremities>
SKIN: Normal except for multiple tattoos and some superficial scars.
PERIPHERAL VASCULAR SYSTEM: Examined and is normal except for 1 large
varicosity, over the dorsum of left foot, which is compressible but it
swells up to about pea size otherwise. I caution the patient to watch this
to see if it increases in size because it may need ligation.
LYMPHATIC EXAM: Normal.
NEUROLOGIC EXAM: Coordination is normal for finger/nose and heel/chin
bilaterally. Reflexes are 2+ equal bilateral for biceps, triceps and
brachial radialis and ankle; absent for right knee and 2+ for left knee.
Toes are downgoing bilaterally. Sensory exam is normal to light touch in
all 4 extremities. Normal to pinprick in bilateral lower extremities except
for diminished pinprick along right leg - along lateral distal thigh,
medial calf and dorsum of foot. Patient is oriented x3 and mood and affect
are normal. Remainder of exam is normal as listed.

IMPRESSION:
Patient has signs and symptoms consistent with right L4 radiculitis and
radiculopathy. In my opinion, he would be a good candidate for right L4
transforaminal epidural steroid injection. Plan and risks were discussed in
detail with the patient and he does wish to proceed. Motrin will be stopped
at least 3 days prior to his procedure.


_____
Donald Stevens, M.D.


Job No:944861
DD:  11/14/2005 16:21
DT:  11/14/2005 17:19
DS/MEDQ


cc:

Health Care Providers
Health Service Unit, MCI Norfolk
2 Clark St, Norfolk, MA 02056

Keith Niemic, M.D.
W61426, MCI Norfolk, 2 Clark St.
Norfolk, MA 02056

Simcha Weller, M.D.
110 Francis Street
Suite 3B
Boston, MA 02215


Run: 11/16/05-10:03 by interface

**Clinical Guidelines**

# Pain Management

## Department of Correction, MA

# Introduction

## Problem Statement

The Department of Correction is a unique setting where many of the patients treated for pain have a history of substance abuse and present security issues such as cheeking, trading and selling medications. This presents the prescriber with many challenges in assessment and treatment. The balance of addressing chronic pain syndromes appropriately while minimizing the risks from opiate use, within this setting, is the main impetus of this Task Force.

**The objectives of the Task Force are as follows:**

- To assist practitioners in the overall management of patients with chronic pain, with specific recommendations for treatment of common chronic pain syndromes.

- To ensure appropriate and adequate treatment of pain, using a step-wise approach, as described by the World Health Organization.

- To provide parameters for the appropriate use of opiates, while monitoring for efficacy and minimizing pseudoaddiction and aberrant behavior.

- To outline educational tools and opportunities, in the current concepts of pain management, for all healthcare providers.

- To describe the use of a multidisciplinary team to assist in complicated cases, with defined responsibilities for team participants.

- To define a system for drug ordering, acquisition and administration that ensures patient confidentiality and safety, while maintaining appropriate drug control and security.

- To implement a prescriber-patient contract, whereby informed consent is obtained, the expectations of both the provider and patient for the duration of care are spelled out and the risks and benefits of long-term opiate treatment is outlined.

# Process and Standards

## Approach and Recommendations

The recommendations provided within this report include the Task Force's collective analysis, evaluation and opinion based on conferences, where a review of the medical standards and literature is examined. The need for consensus guidelines arise when clinicians desire guidance on a subject for which there is a relative deficiency of evidence. Once written and approved by the Task Force, the guidelines are presented to the Pharmacy and Therapeutics Committee for discussion and approval.

This report will focus on a global approach to caring for patients with chronic pain, involving modalities from different disciplines. The pharmacology algorithms are merely one segment of this report and the involvement of multiple disciplines will also be outlined. Since there is a relative lack of evidence-based studies in the treatment of previous substance abusers with opiates, the panel has adopted a step-wise approach to treating pain, as outlined by the World Health Organization. This report will foster a continued effort to improve education, provide clinical training programs regarding chronic pain management, and the proper role and use of opioids.

Security issues are also paramount within the Department of Correction. The guidelines herein will address approaches that will be followed to minimize security breaches and opiate misuse, while patients are treated for pain.

# References

1.  Bradley LA, McKendree-Smith NL. Central nervous system mechanism of pain in fibromyalgia and other musculoskeletal disorders: behavioral and psychologic treatment approaches. *Current Opinion in Rheumatology* 2002; 14:45-51.

2.  Brechner VL. Reflex sympathetic dystrophy. In: Weiner R. ed. Pain Management: A practical guide for clinicians. 5th Ed. Boca Raton, CRC Press, 1998.

3.  Chapman SL, Byas-Smith MG, Reed BA. Effects of intermediate- and long-term use of opioids on cognition in patients with chronic pain. *Clin J Pain* 2002 July/August; 18(4): S83-S90.

4.  Cohen MJ, Jasser S, Herron P, Margolis CG. Ethical perspectives: Opioid treatment of chronic pain in the context of addiction. *Clin J Pain* 2002 July/August; 18(4): S99-S107.

5.  Gatchel RJ, Noe CE, Pulliam C, Robbins H, Deschner M, Gajraj N, et al. A preliminary study of multidimensional pain inventory profile differences in predicting treatment outcome in a heterogeneous cohort of patients with chronic pain. *Clin J Pain* 2002 May/June; 18(3): 139-43.

6.  Gilson AM, Jranson DE. U.S. policies relevant to the prescribing of opioid analgesics for the treatment of pain in patients with addictive disease. *Clin J Pain* 2002 July/August; 18(4): S91-S98.

7.  Jamison, RN. Introduction. *Clin J Pain* 2002 July/August; 18(4): S1-S2.

8.  Kadsan ML, Johnson AL. Reflex sympathetic dystrophy. *Occupational Med* 1998; 19(3): 521-531.

9.  Lindenfeld TN. Reflex sympathetic dystrophy and pain dysfunction in the lower extremity. *J Bone Surg Am* 1996 December; 78-A (12): 1936-44.

10. Linton, SJ. A review of psychological risk factors in back and neck pain. *Spine* 2000 May 1; 25(9): 1148-56.

11. Menefee LA, Katz NP, PAINEDU Manual. Inflexxion, Inc. Available at: http://painedu.org/manual.asp Accessed on August 9, 2002.

12. Mont MA. Current concepts review: Non-Traumatic avascular necrosis of the femoral head. *J Bone Joint Surg Am* 1995 March; 77-A (3): 459-74.

13. Nedeljkovic SS, Wasan A, Jamison RN. Assessment of efficacy of long-term opioid therapy in pain patients with substance abuse potential. *Clin J Pain* 2002 July/August; 18(4): S39-S51.

14. Pittman DM, Miles JB. Complex regional pain syndrome. *Am Fam Phys* 1997; 56(9): 2265-70.

15. Robinson RC, Gatchel RJ, Polatin P, Deschner M, Noe Carl, Gajraj, Noor, et al. Screening for problematic opioid use. *Clin J Pain* 2001 September; 17(3), 220-8.

16. Rothschild BM. Diagnosing and treating fibrositis and fibromyalgia. *Geriatric Consultant* 1990; 9(5/6); 26-8.

17. Rothschild BM, Fibromyalgia: An Explanation for the aches and pains of the 90's. *Comprehensive Therapy* 1991; 17(6): 9-14.

18. Strain EC. Assessment and treatment of comorbid psychiatric disorders in opioid-dependent patients. *Clin J Pain* 2002 July/August 2002; 18(4): S14-S7.

19. Swica Y, Breitbart W. Treating pain in patients with AIDS and a history of substance use. *West J Med* 2002; 176(1): 33-9.

20. Turk DC. Combining somatic and psychosocial treatment for chronic pain patients: Perhaps 1+1 does =3. *Clin J Pain* 2002 December; 17(4): 281-3.

21. Weaver M, Schnoli S. Abuse liability in opioid therapy for pain treatment in patience with an addiction history. *Clin J Pain* 2002 July/August; 18(4): S61-S69.

22. Wolfe F, Smythe HA, Yunus MB, Bennett RM, et al. The American college of rheumatology criteria for the classification of fibromyalgia. *Arthritis Rheum* 1990; 33:160-72.

23. Wolff K. Characterization of methadone overdose: Clinical considerations and the scientific evidence. *Therapeutic Drug Monitoring* 2002 August, 24(4): 457-470.

24. Yunus M, Masi AT, Calabro JJ, Miller KA, Feigenbaum SL. Primary fibromyalgia (fibrositis): Clinical study of 50 patients with matched normal controls. *Semin Arthritis Rheum* 1981,11:151-71.

## Team Meeting

The above parties will meet to evaluate all information collected, assess the patient's condition, and develop a care plan. The primary care provider, who holds the ultimate responsibility and authority in determining the course of action, must approve the plan.

## Implementation

The primary care provider will meet with the patient to discuss implementation of the care plan, expectations for therapeutic outcomes, and goals of therapy. The provider may request other disciplines, as needed, to assist with patient education.

- The patient will review and sign the care plan and patient-prescriber contract. This indicates understanding of the treatment modalities to be employed and the expectations of the patient's participation in all prescribed modalities as a condition of ongoing treatment with narcotic analgesics.

## Ongoing Assessment

**Medical:** Monthly evaluation visit: assess for changes in underlying condition and efficacy of pain control; assess and treat unwanted side effects.

- Assess patient within 7 days of a medication change to evaluate for efficacy and side effects

- Toxicology studies may be ordered, as indicated, for adherence and abuse concerns

- Documentation of patient's function, sleep, mood, social, and diet

- Coordination of care among disciplines.

**Patient:** maintain pain diary (Appendix 3), pain scale; communicate expectations and needs

**Nursing:** observations, documentation of side effects or efficacy/non-efficacy of medication, medication compliance

- Communication and coordination with housing staff: monitoring level of function and daily activities

**Mental health:** intervention and documentation as appropriate

**Physical Therapy:** intervention and documentation as appropriate

**Administrator:** reports of complaints from patient; disciplinary issues

**Team review** of any report of medication misuse or patient's ongoing requests for medication increase. Periodic team meetings should be scheduled regularly, to evaluate complex cases.

**9**

# Differentiation of Pain Syndromes

The patient's record must reflect a primary diagnosis underlying the pain. The patient's symptoms should be related to the diagnosis, and specific symptoms should be described. Ongoing and potential alternative treatments for the diagnosis should be outlined: physical therapy, surgery, etc. The prognosis for the condition and expectation of progression should be documented and periodically updated.

**Chronic non-malignant pain**

- Lower back pain
- musculoskeletal pain
- Fibromyalgia
- Reflex Sympathetic Dystrophy

**Chronic malignant pain**

- Cancer or terminal illness

**Neuropathic pain**

- Diabetes
- HIV/AIDS
- Trauma

**Headache Syndromes**

- Primary
- Secondary

## Moderate to Severe Pain: Formulary Alternatives

**Non-opioid Agent**
Tramadol (Ultram®)

**Combination Agents**
Acetaminophen with Codeine 300mg/30mg (Tylenol #3®)
Oxycodone with Acetaminophen 5mg/325mg (Percocet®)



## Moderate to Severe Pain not Controlled with Optimum Combination Regimen: Formulary Alternatives

**13**

# Headaches

## Acute Migraine Headaches



## Prophylactic Treatment for Migraine

Rebound headache may result from excessive use of any of these medications. Patients having more than two episodes per month may be candidates for prophylactic treatment.

### Prophylactic Treatment For Migraine



# Drug ordering, Acquisition and Administration

- Schedule II controlled substances may be ordered for a maximum duration of 14 days for chronic pain. This includes routinely dosed medications, as well as "prn" orders for breakthrough pain.
- Schedule II controlled substances for acute pain may be ordered for a maximum duration of 7 days.
- The quantity of medication to be dispensed must be specified by the prescriber on all orders for narcotic analgesics.
- Prescriptions for narcotic analgesics must specify an exact dose of medication to be used within given parameters. Dosing ranges are not allowed.
- Patients receiving schedule II and III analgesics must be examined by a provider, at least every thirty days.
- Patients about to receive chronic opioid therapy must sign a consent and an agreement before commencement of therapy. (Appendices 5-6)

## Medication Security

- The nurse receiving medications delivered to the facility is responsible for signing the narcotic medications into the count with a licensed witness or before releasing the narcotic count to another nurse.
- Policy dictates that narcotic medications are to be stored in a double-locked cabinet at all times. The Health Services Administrator is responsible for assuring that adequate storage is available for narcotics, with regard to cabinet size and locking mechanisms. DOC Health Services should be contacted in the event that storage cabinets are inadequate for securing narcotics.
- In order to minimize possible medication errors and narcotic documentation errors, prescribers are encouraged to simplify medication regimens by minimizing the number of different doses and dosage forms prescribed, whenever possible.

## Withdrawal Syndrome and Tapering of Chronic Opiate Treatment

- Chronic use of opioids exceeding one month in duration may elicit withdrawal symptoms upon abrupt discontinuation. Withdrawal syndrome is associated with any or all of the following: runny nose, yawning, large pupils, goose bumps, abdominal pain and cramping, diarrhea, irritability, aches throughout body and a flu-like feeling. Certain medicines (Nubain®, Stadol®) may reverse the action of opioids and can cause a withdrawal syndrome. The following is a guideline for tapering an individual off long acting opioids and may require the clinical judgment of the provider to intervene and minimize withdrawal symptoms.

> Reduce by 50% of previous daily dose for 2 days, then
> Reduce by 25% every 2 days until a dose equivalent to 30mg oral morphine is reached
> Continue at this dose for 2 days
> Discontinue or may institute short -acting drug for an additional few days